| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Case No.: 4:26-CR-00016-FL-RN |
| | ) | |
| James B. Comey, Jr., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JAMES B. COMEY JR.'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS INDICTMENT FOR LACK OF A TRUE THREAT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

    A.    Mr. Comey Is A Public Figure Who Has Prominently Criticized President Trump ............................................................................................................. 3

    B.    Mr. Comey Posts A Picture On Social Media Depicting A Well-Known Political Slogan Opposing President Trump ............................................................. 4

    C.    Mr. Comey Is Indicted For His Instagram Post Almost A Year Later .................. 8

ARGUMENT ...................................................................................................................... 9

I.    THE INDICTMENT FAILS AS A MATTER OF LAW TO ALLEGE THAT MR. COMEY MADE A TRUE THREAT ...................................................................... 11

    A.    No Reasonable Person Would Understand Mr. Comey's Post To Reference Violence ................................................................................................ 11

    B.    Even If Mr. Comey's Post Could Implausibly And Incorrectly Be Taken As Suggesting Violence, It Still Would Not Be a True Threat ............................. 16

        1.    Mr. Comey's post, even if unreasonably read to imply violence, would be political hyperbole, not a true threat ....................................... 16

        2.    Mr. Comey's post does not convey a serious expression of intent to commit any act of violence ................................................................... 20

II.    BEDROCK FIRST AMENDMENT PRINCIPLES REQUIRE DISMISSAL OF THE INDICTMENT AT THE OUTSET OF THE CASE ............................................. 22

    A.    Prosecution Of Political Advocacy Is Irreconcilable With Our Nation's History and Tradition ......................................................................................... 22

    B.    The Chilling Effect Of This Unfounded Indictment Reinforces The Need For Dismissal ..................................................................................................... 26

CONCLUSION ................................................................................................................. 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accountability NOW USA v. Griess*,
2026 WL 1870626 (D.D.C. June 29, 2026)......................................................12, 15, 16, 18, 19

*Biospherics, Inc. v. Forbes, Inc.*,
151 F.3d 180 (4th Cir. 1998) ................................................................................................11, 28

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485 (1984)....................................................................................................................27

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000)..............................................................................................................29, 30

*Brandenburg v. Ohio*,
395 U.S. 444 (1969).....................................................................................................................21

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ...................................................................................................28

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)..........................................................................................................29, 30

*Counterman v. Colorado*,
600 U.S. 66 (2023)...........................................................................................................9, 10, 12

*Deaver v. Seymour*,
822 F.2d 66 (D.C. Cir. 1987) .....................................................................................................29

*Dolan v. USPS*,
546 U.S. 481 (2006)....................................................................................................................13

*Dombrowski v. Pfister*,
380 U.S. 479 (1965)..............................................................................................................28, 29

*Edwards v. Schwartz*,
378 F. Supp. 3d 468 (W.D. Va. 2019) .......................................................................................13

*Mahmoud v. Taylor*,
606 U.S. 522 (2025).....................................................................................................................29

*McGlothlin v. Hennelly*,
370 F. Supp. 3d 603 (D.S.C. 2019).............................................................................................28

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)..............................................................................................................22, 24, 30

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)......................................................................................21, 27

*Rankin v. McPherson*,
483 U.S. 378 (1987)......................................................................................17, 20

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)..............................................................................................28

*Snyder v. Phelps*,
562 U.S. 443 (2011)......................................................................................11, 29

*State v. Metzinger*,
456 S.W.3d 84 (Mo. Ct. App. 2015).................................................................11

*State v. Van Pelt*,
49 S.E. 177 (N.C. 1904)......................................................................................23

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)............................................................................................29

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012)............................................................................................12

*Texas v. Johnson*,
491 U.S. 397 (1989)............................................................................................11

*Trueman v. United States*,
2013 WL 12651512 (E.D.N.C. Sept. 17, 2013).................................................29

*United States v. Al-Timimi*,
164 F.4th 292 (4th Cir. 2026) ............................................................................22

*United States v. Alvarez*,
567 U.S. 709 (2012)............................................................................................22

*United States v. Anderegg*,
2025 WL 3126093 (W.D. Wis. Feb. 13, 2025)..................................................28

*United States v. Armel*,
585 F.3d 182 (4th Cir. 2009) ........................................................................10, 13

*United States v. Baker*,
890 F. Supp. 1375 (E.D. Mich. 1995).............................................................10, 11

Case 4:26-cr-00016-FL-RN    Document 33    Filed 07/27/26    Page 4 of 42

*United States v. Bly*,
510 F.3d 453 (4th Cir. 2007) ...................................................................................21

*United States v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023) ...........................................................................9, 10, 28

*United States v. Comey*,
810 F. Supp. 3d 768 (E.D. Va. 2025) ........................................................................4

*United States v. Cook*,
472 F. Supp. 3d 326 (N.D. Miss. 2020) ..............................................................10, 26

*United States v. Cooper*,
865 F.2d 83 (4th Cir. 1989) ...............................................................................9, 21

*United States v. Daley*,
378 F. Supp. 3d 539 (W.D. Va. 2019) ......................................................................13

*United States v. Daulong*,
60 F. Supp. 235 (W.D. La. 1945) .............................................................................11

*United States v. Landham*,
251 F.3d 1072 (6th Cir. 2001) ..........................................................................10, 20

*United States v. Lockhart*,
382 F.3d 447 (4th Cir. 2004) .......................................................................17, 18, 21

*United States v. Maisonet*,
484 F.2d 1356 (4th Cir. 1973) ................................................................................11

*United States v. O'Dwyer*,
443 F. App'x 18 (5th Cir. 2011) ..............................................................................10

*United States v. Pope*,
613 F.3d 1255 (10th Cir. 2010) ................................................................................9

*United States v. Price*,
111 F.4th 392 (4th Cir. 2024) .................................................................................13

*United States v. Stock*,
728 F.3d 287 (3d Cir. 2013) .............................................................................10, 16

*United States v. Vandevere*,
849 F. App'x 69 (4th Cir. 2021) ..............................................................................18

*United States v. Weaver*,
659 F.3d 353 (4th Cir. 2011) ............................................................................9

*United States v. White*,
670 F.3d 498 (4th Cir. 2012) ..............................................................18, 20, 27

*United States v. White*,
810 F.3d 212 (4th Cir. 2016) ..........................................................................10

*Vidal v. Elster*,
602 U.S. 286 (2024)..........................................................................................22

*Virginia v. Black*,
538 U.S. 343 (2003)..........................................................................................10

*Watts v. United States*,
394 U.S. 705 (1969).................................................................................. *passim*

*West Virginia Bd. of Ed. v. Barnette*,
319 U.S. 624 (1943)..........................................................................................29

**Constitutions**

U.S. Const. amend. I ........................................................................................ *passim*

U.S. Const. art. III, § 3 .......................................................................................23

**Statutes**

18 U.S.C.
§ 871(a) .........................................................................................................8
§ 875(c) .........................................................................................................8

Sedition Act of 1798, ch. 74, § 2, 1 Stat. 596 (expired 1801) ................................23, 24

Treason Act of 1351, 25 Edw. 3 Stat 5 c. 2 ...............................................................23

**Other Authorities**

159 Cong. Rec. S6004 (daily ed. July 29, 2013) ..........................................................3

*8646 Impeach Biden T-Shirt*, Amazon.com (last visited July 23, 2026) ....................5, 14

Ana Faguy & Brandon Drenon, *Trump Says He Was 'Not Threatening Death' to
Democrats over Video to Troops*, BBC News (Nov. 21, 2025) .............................25

Case 4:26-cr-00016-FL-RN    Document 33    Filed 07/27/26    Page 6 of 42

Andrew Solender & Jack Brewster, *Marjorie Taylor Greene Signaled Approval for Executing Top Democrats Before Seeking Office*, Forbes (Jan. 26, 2021) ........................25

*The Attempt to Kill "King Andrew,"* U.S. Senate....................................................................24, 25

Clara Hendrickson, *What Is '8645'? Whitmer's Pin an Anti-Trump Message Using Restaurant Industry Slang*, Det. Free Press (Oct. 19, 2020) .........................................14

Colby Hall, *Trump Rages at Comey 'Calling for Assassination' - Says Justice Department Will 'Handle It'*, Mediaite (May 16, 2025, at 08:57 ET)....................................7

Deirdre Walsh, *Rep. Gosar is Censured Over an Anime Video Depicting Him Killing AOC*, NPR (Nov. 17, 2021) .....................................................................................25

Devlin Barrett, *Blanche Says Others Who Post '86 47' Message Won't Be Charged Like Comey*, N.Y. Times (May 3, 2026)...................................................14, 15

Donald J. Trump (@realDonaldTrump)
Truth Social (Sept. 20, 2025, at 18:44 ET)................................................................4
X (Apr. 27, 2018, at 06:26 ET).................................................................................4
X (Apr. 30, 2020, at 08:07 ET) (deleted) (reposted from Dan Bongino, @dbongino) ............4

Donald Trump Jr. (@DonaldJTrumpJr), X (May 15, 2025, at 20:49 ET)....................................7

Ed Morrissey,
*Hume: Obama's Really Going to Have to Go Negative*, Hot Air (June 5, 2012)..............13, 14

*Eighty-Six*
Am. Heritage Dictionary of the Eng. Language (5th ed. 2022)..............................................12
Merriam-Webster Dictionary.................................................................................12
Oxford Eng. Dictionary ........................................................................................12

Eighty-Six Trump PAC, *Notice of Organization (CF-1)*, R.I. Bd. of Elections Campaign Fin. Unit (Aug. 1, 2019)..........................................................................................13

Eugene Volokh, *Symbolic Expression and the Original Meaning of the First Amendment*, 97 Geo. L.J. 1057 (2009) ..........................................................................................24

Federal Rule of Criminal Procedure
12.................................................................................................................9
12(b)(1) .......................................................................................................9
12(b)(3)(B)(v) ................................................................................................9

Gregory Svirnovskiy, *James Comey Sparks Republican Outrage with Trump Social Media Post*, Politico (May 15, 2025).......................................................7, 21

Case 4:26-cr-00016-FL-RN    Document 33    Filed 07/27/26    Page 7 of 42

*Here Are 5 Takeaways from Trump's First Major Foreign Trip to the Middle East*, NPR (May 16, 2025, 2:38 PM ET)................................................................6

James Comey (@comey)
  *A Message for My Former Colleagues at the FBI, DOJ, and U.S. Attorney's Offices Around the Country*, Instagram (Feb. 1, 2025)..........................................15
  *Every American Should Vote Country over Party in 2024*, Instagram (Oct. 3, 2024).............15
  Instagram (Feb. 13, 2025)...........................................................................15
  *Kamala Harris Made Me Feel Like It's Finally Morning in America.*, Instagram (Aug. 23, 2024)...................................................................15
  *My Message to the FBI*, Instagram (Dec. 10, 2024) .............................................15

James Griffiths, *Trump Says He Considered 'This Russia Thing' Before Firing FBI Director Comey*, CNN (May 12, 2017) .............................................................3

James Willard Hurst, *The Law of Treason in the United States: Collected Essays* (1971)...........23

James Willard Hurst, *Treason in the United States*, 58 Harv. L. Rev. 395 (1945)........................23

John C. Miller, *The Federalist Era 1789-1801* (1998) .....................................................24

John G. Bellamy, *The Law of Treason in England in the Later Middle Ages* (1970) .............22, 23

Josephine Harvey, *Kash Patel Rages at James Comey Over Cryptic Trump Post*, Daily Beast (May 29, 2025)......................................................................7

Karma Allen, *State Senator Who Posted About Trump Assassination Apologizes, But Refuses to Step Down*, ABC News (Aug. 21, 2017) .......................................25

Laerke Christensen, *Conservative Influencer Jack Posobiec's '86 46' Post Resurfaces After Comey Indictment*, Snopes (Apr. 30, 2026) .................................14

Mark Joyella, *James Comey Tells MSNBC Trump's Second Term Would Put 'Bottom of the Barrel' People in Power*, Forbes (May 22, 2024) ........................3, 4

Matt Gaetz (@mattgaetz), X (Feb. 28, 2024, at 17:27 ET) ..........................................13

Michael S. Schmidt, *Trump Wanted I.R.S. Investigations of Foes, Top Aide Says*, N.Y. Times (Nov. 13, 2022) ......................................................................4

MSNBC, *Comey: Trump is Coming for the FBI, DOJ* (YouTube, May 22, 2024).....................3, 4

Paul Woolverton, *Nationwide Anti-Trump Protest Included Rally in Fayetteville Saturday*, CityView (Apr. 5, 2025)..................................................................14

Sam Cabral, *Trump Says Cheney Wouldn't Be 'War Hawk' if 'Guns are Trained on Her'*, BBC News (Nov. 1, 2024) .................................................................26

Special Envoy Kristi Noem (@EnvoyNoem), X (May 15, 2025, at 22:19 ET) ..............................7

*Subtle Anti Trump 8647 T-Shirt*, Amazon.com (last visited July 23, 2026)..............................5, 14

*Threats to Take the Life of the President*, 32 Harv. L. Rev. 724 (1919) .......................................23

Tommy Christopher, *Trump FBI Chief Kash Patel Says He's Got Agents Chasing 'Copycat Threats' After Comey '86 47' Seashell Flap*, Mediaite (May 29, 2025) ...................2

*Transcript: James Comey's Interview with ABC News Chief Anchor George Stephanopoulos*, ABC News (Apr. 15, 2018) ...............................................................................3

*US Election: Anger over Donald Trump Gun Rights Remarks*, BBC News (Aug. 10, 2016)..............................................................................................25, 26

Violet Miller & Anna Savchenko, *Hands Off Protest in Downtown Chicago Draws Thousands Criticizing Trump's Policies*, WBEZ Chi. (Apr. 5, 2025)....................5, 14

*What Does 'Eighty-Six' Mean?*, Merriam-Webster.......................................4, 12, 20, 21

Case 4:26-cr-00016-FL-RN    Document 33    Filed 07/27/26    Page 9 of 42

## INTRODUCTION

This indictment targets protected speech at the heart of the First Amendment. Mr. Comey, an outspoken critic of President Trump, posted a photograph of seashells spelling out "86 47," a well-known political slogan that expresses opposition to the President. In fact, thousands of items featuring this slogan have been sold on the internet and are available to this day, and the slogan was commonly displayed at protests around the country in the months preceding Mr. Comey's post. But the government now singles out Mr. Comey to prosecute one of the President's most prominent critics for publishing another person's statement of political opposition. That attempt to suppress core political speech contravenes both the statutes at issue and the First Amendment.

To justify this prosecution, the indictment alleges that Mr. Comey's "86 47" post constitutes a "true threat" on the President's life. That claim is contradicted by every possible source of meaning: dictionaries, context, precedent, and common sense. "86" simply means "get rid of" or "eject" and has no violent connotation except in the most uncommon usages. Most dictionaries do not even list the meaning—"to kill"—that the government now proposes. And when combined with "47"—slang for President Trump, the forty-seventh President—"86" becomes nothing more than a call to oppose President Trump. Thus, in this context, no reasonable observer would understand the phrase "86 47" to connote violence at all—let alone to threaten that Mr. Comey personally would commit violence against the President.

Even under the least charitable interpretation of Mr. Comey's statement, it would not constitute a true threat—*i.e.*, a serious expression of Mr. Comey's intent to harm the President. Some of Mr. Comey's critics, including the President, have claimed that the post should be implausibly read as a veiled call for *other* people to act violently. But even if that were a viable interpretation (and it is not), that still would not make the post a true threat—the only crime alleged in the indictment. Instead, such a statement would constitute what the Supreme Court has

1

recognized to be protected political hyperbole. And such a hyperbolic appeal to others would not remotely qualify as an incitement to violence—an offense the indictment does not charge in any event. The true-threat theory thus fails under an objective reasonable observer test as a matter of law. Courts have regularly dismissed indictments alleging statements far more "threatening" than Mr. Comey's social media post, and the same result is warranted here.

Allowing this prosecution to proceed would sharply depart from our Nation's history and tradition. Under British law, citizens could be prosecuted and executed for speaking about the death of the King. But the Founders emphatically rejected that practice in the Constitution. And the controversy in the Nation's early years over the Alien and Sedition Acts established the bedrock premise that Americans are free to criticize government officials in direct and even strident terms. That is now a central tenet under the First Amendment. Thus, Americans have long exercised their constitutional freedoms by using inflammatory and even violent rhetoric when expressing opposition to government officials. Even if Mr. Comey's post could be plausibly construed as an abstract call to violence (and it cannot), the government's attempt to prosecute him for that post is antithetical to fundamental First Amendment principles dating to the Founding.

Because the indictment targets and chills core political speech and fails as a matter of law, it must be dismissed at this juncture. Forcing Mr. Comey to stand trial for a statement opposing the President—even if he is ultimately acquitted—would itself be an unconstitutional punishment of free speech. And it would invite future prosecutions by the Executive Branch against perceived political enemies for their opposition to the President. Government officials have already warned that they plan to target citizens if they "copycat" Mr. Comey's "political statement." Tommy Christopher, *Trump FBI Chief Kash Patel Says He's Got Agents Chasing 'Copycat Threats' After Comey '86 47' Seashell Flap*, Mediaite (May 29, 2025), https://perma.cc/P8PV-7JVT. But the

2

First Amendment bars the government from using criminal prosecution to silence political opposition. The indictment must be dismissed.

**STATEMENT OF FACTS**

While the indictment fails on its face to allege a true threat, the background to this prosecution underscores the danger to free speech that it poses.

### A. Mr. Comey Is A Public Figure Who Has Prominently Criticized President Trump

Mr. Comey is a private citizen who spent almost twenty years in government service. Mr. Comey served as an Assistant United States Attorney, United States Attorney, Deputy Attorney General under President George W. Bush, and Director of the Federal Bureau of Investigation (FBI) under President Obama. For this last role, Mr. Comey was confirmed by the Senate in a vote of 93 to 1. 159 Cong. Rec. S6004 (daily ed. July 29, 2013).

Mr. Comey continued to serve as FBI Director after President Trump was first elected in 2016. In 2017, President Trump fired Mr. Comey because of the FBI's investigation into Russian interference in the 2016 election. James Griffiths, *Trump Says He Considered 'This Russia Thing' Before Firing FBI Director Comey*, CNN (May 12, 2017), https://perma.cc/DXD5-FYYQ. Mr. Comey has been a private citizen ever since, and he has prominently exercised his First Amendment right to criticize President Trump. For example, Mr. Comey has called President Trump "untethered to truth," "unethical," and "morally unfit to be President." *Transcript: James Comey's Interview with ABC News Chief Anchor George Stephanopoulos*, ABC News (Apr. 15, 2018), https://perma.cc/6PZM-2ZEW. During the 2024 election campaign, Mr. Comey publicly warned that a second Trump term would have "serious" implications "for the Justice Department and the FBI, because Trump is coming for those institutions," and that it would be a "danger for all Americans." MSNBC, *Comey: Trump is Coming for the FBI, DOJ*, at 06:16 (YouTube, May

3

22, 2024), https://perma.cc/A692-NVAM; Mark Joyella, *James Comey Tells MSNBC Trump's Second Term Would Put 'Bottom of the Barrel' People in Power*, Forbes (May 22, 2024), https://perma.cc/WHW4-LN7D.

President Trump has criticized Mr. Comey far more harshly. For example, President Trump has called Mr. Comey "either very sick or very dumb," and "a corrupt piece of garbage." Donald J. Trump (@realDonaldTrump), X (Apr. 27, 2018, at 06:26 ET), https://perma.cc/BR25-WP3A; Donald J. Trump (@realDonaldTrump), X (Apr. 30, 2020, at 08:07 ET) (deleted) (reposted from Dan Bongino, @dbongino), https://perma.cc/24UU-JQCC. President Trump has also repeatedly urged his subordinates in the Executive Branch to wield the government's authority against Mr. Comey. Michael S. Schmidt, *Trump Wanted I.R.S. Investigations of Foes, Top Aide Says*, N.Y. Times (Nov. 13, 2022), https://perma.cc/G2FL-7HCQ. For instance, on September 20, 2025, President Trump publicly pressed then-Attorney General Pam Bondi to prosecute Mr. Comey. *See* Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 20, 2025, at 18:44 ET), https://perma.cc/A7RW-2TEC. Ms. Bondi then appointed a new purported interim U.S. Attorney in the Eastern District of Virginia, who secured an indictment of Mr. Comey on her fourth day in office. That indictment was dismissed less than two months later. *See United States v. Comey*, 810 F. Supp. 3d 768 (E.D. Va. 2025).

### B. Mr. Comey Posts A Picture On Social Media Depicting A Well-Known Political Slogan Opposing President Trump

On May 15, 2025, Mr. Comey encountered an arrangement of seashells on a public beach in North Carolina spelling out "86 47." Although Mr. Comey did not know who created the arrangement, Mr. Comey came to understand the phrase "86 47" as a clever way of expressing political opposition to President Trump. "86" is a slang term derived from the restaurant industry that means to "get rid of" or "throw out." *What Does 'Eighty-Six' Mean?*, Merriam-Webster,

4

https://perma.cc/3KZD-9LXL. And "86 47"—with the "47" representing President Trump as the 47th President—is a common political slogan calling for opposition to the President. Many online retailers, like Amazon, sell items with the slogan "86 47," just as items featuring "86 46," "86 45," and "86 44" were sold to express opposition to previous presidents. *See, e.g.*, *Subtle Anti Trump 8647 T-Shirt*, Amazon.com, https://perma.cc/2QDS-FCVB (last visited July 23, 2026); *8646 Impeach Biden T-Shirt*, Amazon.com, https://perma.cc/HVE3-7S42 (last visited July 23, 2026). And in early 2025, opponents of the President commonly displayed "86 47" signs, apparel, and flags at protests around the country. *See, e.g.*, Violet Miller & Anna Savchenko, *Hands Off Protest in Downtown Chicago Draws Thousands Criticizing Trump's Policies*, WBEZ Chi. (Apr. 5, 2025), https://perma.cc/XHX7-7H7K.

Mr. Comey posted a photograph of the arrangement on the social media site Instagram accompanied with the comment "Cool shell formation on my beach walk":



comey Cool shell formation on my beach walk

Mr. Comey's description of the shell formation as "[c]ool" communicated his admiration for the way in which an anonymous person criticized President Trump. The post expressed nothing about Mr. Comey taking any action. Because Mr. Comey's post was on a public account, it was immediately visible to his nearly two hundred thousand Instagram followers and, more broadly, to Instagram's billions of users. It was not directed to President Trump. When Mr. Comey made the post, President Trump was travelling in Qatar and the United Arab Emirates, almost 7,000 miles from North Carolina. *Here Are 5 Takeaways from Trump's First Major Foreign Trip to the Middle East*, NPR (May 16, 2025, 2:38 PM ET), https://perma.cc/CLP5-KH5G.

After Mr. Comey publicly posted the image, President Trump and his supporters

6

immediately attacked him for it.  Although some such supporters, like FBI Director Kash Patel, recognized the post as "a political stand," Josephine Harvey, *Kash Patel Rages at James Comey Over Cryptic Trump Post*, Daily Beast (May 29, 2025), https://perma.cc/Q3KN-MSC3, others suggested that the slogan "86 47" could refer to violence against President Trump.  *See* Gregory Svirnovskiy, *James Comey Sparks Republican Outrage with Trump Social Media Post*, Politico (May 15, 2025), https://perma.cc/GRP3-7V9T.  For example, President Trump himself said Mr. Comey's post was "calling for assassination of the president."  Colby Hall, *Trump Rages at Comey 'Calling for Assassination' — Says Justice Department Will 'Handle It'*, Mediaite (May 16, 2025, at 08:57 ET), https://perma.cc/FX3M-P8QU.  A former cabinet official to whom the Secret Service reported similarly asserted the post had "called for the assassination" of the President.  Special Envoy Kristi Noem (@EnvoyNoem), X (May 15, 2025, at 22:19 ET), https://perma.cc/H325-7CC5.  And the President's son remarked that Mr. Comey had "call[ed] for [his] dad to be murdered."  Donald Trump Jr. (@DonaldJTrumpJr), X (May 15, 2025, at 20:49 ET), https://perma.cc/3VRL-YARD.

Mr. Comey was not previously aware of any violent connotation of "86 47," which (as explained above) is a popular political slogan.  But based on the controversy that was stoked, Mr. Comey deleted the post within hours.  After removing the post, Mr. Comey created another public post on Instagram, making clear that he was unaware that "86 47" could ever have a violent meaning:

7



comey ✓  Follow ···

♡ 4.2K  ⤴ 14  ▷      🔖
May 15, 2025

I posted earlier a picture of some shells I saw today on a beach walk, which I assumed were a political message. I didn't realize some folks associate those numbers with violence. It never occurred to me but I oppose violence of any kind so I took the post down.

Mr. Comey later contacted the local police chief to notify him about the controversy over the post. Mr. Comey also agreed to be interviewed by Secret Service agents that same night and again the next day.

### C. Mr. Comey Is Indicted For His Instagram Post Almost A Year Later

On April 28, 2026, almost a year after his Instagram post, a grand jury in this District returned an indictment against Mr. Comey charging two counts. *See* Dkt. 1. Count One alleges that Mr. Comey "knowingly and willfully ma[d]e a threat to take the life of, and to inflict bodily harm upon, the President," in violation of 18 U.S.C. § 871(a). Dkt. 1 at 1. Count Two alleges that Mr. Comey "knowingly and willfully did transmit in interstate and foreign commerce a communication that contained a threat to kill the President, Donald J. Trump," in violation of 18 U.S.C. § 875(c). Dkt. 1 at 1-2. In both counts, the sole basis given for the charges is that Mr. Comey "publicly posted a photograph on the internet social media site Instagram which depicted seashells arranged in a pattern making out '86 47,' which a reasonable recipient who is familiar with the circumstances would interpret as a serious expression of an intent to do harm to" the President. *Id.*

8

## ARGUMENT

The indictment should be dismissed under Federal Rule of Criminal Procedure 12, which provides for dismissal of defective indictments. Fed. R. Crim. P. 12. In applying Rule 12, "district courts have as much of a responsibility to police criminal indictments as they do civil complaints." *United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023). Dismissal of the indictment here is warranted under two subsections of Rule 12. First, Rule 12(b)(3)(B)(v) provides that an indictment may be dismissed for "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). An indictment "fail[s] to state an offense if 'the allegations therein, even if true,'" would not meet the elements of the crime. *Brewbaker*, 87 F.4th at 572 (citation omitted). "[W]hether the allegations fail to state an offense is a legal question" decided by a court, not a factfinder. *Id.* Second, under Rule 12(b)(1), a court must dismiss an indictment if it "can determine without a trial on the merits" and "*as a matter of law*," that "the government is incapable of proving its case beyond a reasonable doubt." *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010) (Gorsuch, J.) (citation omitted). In that situation, "[t]here is no good reason to force the court to incur the expense and delay of a trial that would inevitably lead to the same outcome as its pretrial ruling." *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011).

Here, under either standard, the indictment's validity turns on a single issue of law: whether Mr. Comey's post was a "true 'threat.'" *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). Because both statutes at issue (Sections 871 and 875) "make[] criminal a form of pure speech," they "must be interpreted with the commands of the First Amendment clearly in mind." *Id.* at 707. Thus, the Supreme Court and Fourth Circuit have interpreted the relevant statutes to cover only "true 'threat[s],'" not "political hyperbole." *Id.* at 708; *see United States v. Cooper*, 865 F.2d 83, 85 (4th Cir. 1989).

A true threat is a "serious expression" conveying that the speaker himself means to

9

"commit an act of unlawful violence." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citation omitted). A statement is a true threat only if "an ordinary reasonable recipient who is familiar with the context . . . would interpret [the statement] as a threat of injury." *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009) (citation omitted); *see United States v. White*, 810 F.3d 212, 221 (4th Cir. 2016).[1]

Courts recognize that some cases involving statements alleged to be true threats are "so clear . . . that they can be resolved as a matter of law" on a motion to dismiss. *United States v. Stock*, 728 F.3d 287, 293 (3d Cir. 2013) (alteration in original) (citation omitted). In such a case, "the district court, and not the grand jury, must decide [the] questions of law" and dismiss the indictment as invalid. *Brewbaker*, 87 F.4th at 579. Courts have thus dismissed indictments when the charged statement, as a matter of law, cannot be a true threat. *See, e.g.*, *United States v. Landham*, 251 F.3d 1072, 1081-82 (6th Cir. 2001) (holding that indictment should have been dismissed "as a matter of law" because the alleged "statement contains no communication containing a direct threat" and no "reasonable observer" would "perceive it as an indirect threat"); *United States v. O'Dwyer*, 443 F. App'x 18, 20 (5th Cir. 2011) (per curiam) (affirming dismissal of indictment because the defendant's "statement [was] not a true threat as a matter of law"); *United States v. Cook*, 472 F. Supp. 3d 326, 335 (N.D. Miss. 2020) (dismissing indictment based on speech that "d[id] not rise to the level of true threats"); *United States v. Baker*, 890 F. Supp. 1375, 1388 (E.D. Mich. 1995) (dismissing indictment that "f[ell] short of the constitutional 'true

---

[1] The government must also meet a subjective-intent standard to justify prosecution consistent with the First Amendment. *Counterman*, 600 U.S. at 75-82. The facts refute any such intent here, but this motion focuses on the threshold objective requirement for a threats prosecution—namely, that an objective, reasonable observer must understand the statement as a "'serious expression[]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Id.* at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Because the government cannot satisfy that standard, the indictment must be dismissed.

threat' requirement"), *aff'd sub nom. United States v. Alkhabaz*, 104 F.3d 1492, 1496 (6th Cir. 1997); *United States v. Daulong,* 60 F. Supp. 235, 236 (W.D. La. 1945) (dismissing indictment because the charged statements "fall considerably short of an expression of determination or intent to do the act itself, that is, to take the life of the President"); *State v. Metzinger*, 456 S.W.3d 84, 97 (Mo. Ct. App. 2015) (dismissing indictment because the charged statement was made "in the context of [a] sports rivalry, an area often subject to impassioned language and hyperbole" and therefore could not have seriously expressed an intent to commit violence).

## I. THE INDICTMENT FAILS AS A MATTER OF LAW TO ALLEGE THAT MR. COMEY MADE A TRUE THREAT

The indictment should be dismissed because it does not allege a true threat. No reasonable observer who was aware of the relevant context would read the phrase "86 47" to connote violence against the President. But even if "86 47" could implausibly be read to suggest violence, a reasonable observer would still understand Mr. Comey's post as mere political hyperbole, not a true threat. The Supreme Court has rejected threats prosecutions based on speech far more directly threatening than Mr. Comey's seashells post here.

### A. No Reasonable Person Would Understand Mr. Comey's Post To Reference Violence

Whether a statement constitutes a true threat "must be determined in the light of the context in which it was written." *United States v. Maisonet*, 484 F.2d 1356, 1358 (4th Cir. 1973). That contextual approach runs across First Amendment law. *See Snyder v. Phelps*, 562 U.S. 443, 454 (2011) ("[I]t is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said."); *Texas v. Johnson*, 491 U.S. 397, 409 (1989) (requiring "careful consideration of the actual circumstances surrounding [the] expression"); *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) ("[T]he context and 'general tenor' . . . indicate that the piece contains constitutionally protected subjective views." (citation omitted)). It

11

follows that a statement cannot be a true threat when, "taken in context," it "do[es] not convey a real possibility that violence will follow." *Counterman*, 600 U.S. at 74. That is the case here: When viewed in context, a reasonable objective observer would understand Mr. Comey's post as a nonviolent political statement—not as a reference to violence.

To start, the ordinary meaning of "86" does not connote violence. Merriam-Webster states that "[e]ighty-six is slang meaning 'to throw out,' 'to get rid of,' or to 'refuse service to.'" *What Does 'Eighty-Six' Mean?*, Merriam-Webster, https://perma.cc/3KZD-9LXL. The term "comes from 1930s soda-counter slang meaning that an item was sold out." *Id.* By the 1950s, "86" came to be "used as a verb, at first meaning 'to refuse to serve a customer,' later coming to mean 'to get rid of; to throw out,' and still later coming to mean 'shut out' or 'rejected.'" *Accountability NOW USA v. Griess*, 2026 WL 1870626, at *15 (D.D.C. June 29, 2026) (quoting Merriam-Webster, *supra*). According to Merriam-Webster, this is "[t]he most common meaning . . . encountered today." Merriam-Webster, *supra*.

To be sure, in more recent times, "86" has on isolated occasions been used to mean "'to kill.'" *Id.* But that usage is so "sparse[]" that Merriam-Webster does not endorse it and most dictionaries do not include it. *Id.*; *see, e.g.*, *Eighty-Six*, Merriam-Webster Dictionary, https://perma.cc/P8ZF-6RA3; *Eighty-Six*, Am. Heritage Dictionary of the Eng. Language (5th ed. 2022), https://perma.cc/BGS5-PBSK ("To refuse to serve (an unwelcome customer) at a bar or restaurant; To throw out; eject; To throw away; discard."); *Eighty-Six*, Oxford Eng. Dictionary, https://perma.cc/5D9G-3DT8 ("to eject or debar (a person) from"). And "[a]ny definition of a word that is absent from many dictionaries . . . is hardly a common or ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012). Nor has "86" entered the popular lexicon as a synonym for "kill"—as evidenced by the dearth of such usage in books,

12

movies, and TV shows, except for in a handful of dated instances. As explained above, the "true threats" test turns on the interpretation of "an ordinary reasonable recipient," *Armel*, 585 F.3d at 185 (citation omitted), and dictionaries make clear that ordinary reasonable recipients would not interpret "86" to mean "kill."

The "context" here confirms that reasonable observers would have interpreted Mr. Comey's post as using "86" in its ordinary sense, not in a sense that stretches "to the outer limits of [the term's] definitional possibilities." *Dolan v. USPS*, 546 U.S. 481, 486 (2006). The relevant context is political discourse on a public social media site about an elected official. And in the context of public discourse, "86," in conjunction with a political official, has an even more settled non-violent meaning—namely, a political official has been "86'd" when he has been removed from office.

For example, a former Republican official launched a political action committee in 2019 with the name "Eighty-Six Trump," which aimed to support the President's political opponents in unseating him. Eighty-Six Trump PAC, *Notice of Organization (CF-1)*, R.I. Bd. of Elections Campaign Fin. Unit (Aug. 1, 2019), https://perma.cc/R8KZ-8D4B.[2] Similarly, after several Republican leaders were ousted from leadership roles, a former member of the House of Representatives posted: "We've now 86'd: McCarthy McDaniel McConnell Better days are ahead for the Republican Party." Matt Gaetz (@mattgaetz), X (Feb. 28, 2024, at 17:27 ET), https://perma.cc/8PWV-DGTC. And in 2012, a commenter on a website predicted (incorrectly) that President Obama's loss of the presidency would be blamed on the "electorate" choosing to

---

[2] The Court can take judicial notice of "incontrovertible matter[s] of public record" in resolving a motion to dismiss an indictment. *United States v. Daley*, 378 F. Supp. 3d 539, 547 (W.D. Va. 2019); *see, e.g.*, *United States v. Price,* 111 F.4th 392, 407 (4th Cir. 2024) (government reports); *cf. Edwards v. Schwartz*, 378 F. Supp. 3d 468, 519 n.29 (W.D. Va. 2019) (newspaper article).

"eighty-six him" because of his stance on same-sex marriage. Ed Morrissey, *Hume: Obama's Really Going to Have to Go Negative*, Hot Air (June 5, 2012), *archived at*, https://perma.cc/JDB2-JUJC. No reasonable person would understand those uses of "86" in the political arena to suggest violence; they are unambiguous references to removing an official from office.

Combining "86" with a numerical shorthand for a President's term of office is a particularly common slogan of political opposition. Merchandise featuring such phrases is widespread, and prominent commentators and public figures have routinely used such phrases. During the first Trump presidency, a sitting Democratic governor appeared in a press conference with an "86 45" pin visible on a table behind her. Clara Hendrickson, *What Is '8645'? Whitmer's Pin an Anti-Trump Message Using Restaurant Industry Slang*, Det. Free Press (Oct. 19, 2020), https://perma.cc/GC2V-MEVK. During the Biden presidency, a conservative internet personality posted the phrase "86 46" on a social media site. Laerke Christensen, *Conservative Influencer Jack Posobiec's '86 46' Post Resurfaces After Comey Indictment*, Snopes (Apr. 30, 2026), https://perma.cc/674F-9D9W. And merchandise featuring "86 44," "86 45," "86 46," and "86 47" slogans is widely available at large online retailers like Amazon and has been purchased thousands of times. *See, e.g.*, *Subtle Anti Trump 8647 T-Shirt*, Amazon.com, https://perma.cc/2QDS-FCVB (last visited July 23, 2026); *8646 Impeach Biden T-Shirt*, Amazon.com, https://perma.cc/HVE3-7S42 (last visited July 23, 2026). Most pertinent here, in the months leading up to Mr. Comey's post, "86 47" flags, signs, and apparel were regularly displayed at protests around the country. *See, e.g.*, Paul Woolverton, *Nationwide Anti-Trump Protest Included Rally in Fayetteville Saturday*, CityView (Apr. 5, 2025), https://perma.cc/NB2Y-MXSP; Miller & Savchenko, *supra*. Even the Acting Attorney General has acknowledged that the phrase "86 47" "is used constantly." Devlin Barrett, *Blanche Says Others Who Post '86 47'*

14

*Message Won't Be Charged Like Comey*, N.Y. Times (May 3, 2026), https://perma.cc/CP8C-3EJ9.

Against that backdrop, Mr. Comey's public social media post of somebody else's arrangement of seashells forming the phrase "86 47" is clearly nonviolent. To any objective recipient, the post expressed political opposition to the President.

Although not necessary to the analysis of the objective meaning of the "86 47" post, the political nature of that message is even more evident in light of Mr. Comey's Instagram posts preceding his May 15, 2025, seashells post—which would have been visible to Instagram users viewing Mr. Comey's account. Those posts expressed overtly political messages—from advocating for Kamala Harris's election as President to emphasizing the importance of the rule of law.[3] In that context, no reasonable person would read Mr. Comey's post expressing a familiar political message to mean that Mr. Comey intended to personally inflict harm on the President.

The recent decision in *Accountability NOW USA v. Griess*, 2026 WL 1870626 (D.D.C. June 29, 2026), is instructive. There, the court granted summary judgment and an injunction barring the government from taking enforcement action against an organization "calling for the impeachment and removal of President Donald Trump," based on the organization's display of a "flag with the legend '8647.'" 2026 WL 1870626, at *1. The court explained that "the relevant context makes clear that no reasonable observer could have viewed [the organization's] display of the flag as a threat to the President's life or physical safety." *Id.* at *16. The court emphasized

---

[3] *See, e.g.*, James Comey (@comey), Instagram (Feb. 13, 2025), https://perma.cc/EZ7B-W5TU; James Comey (@comey), *A Message for My Former Colleagues at the FBI, DOJ, and U.S. Attorney's Offices Around the Country*, Instagram (Feb. 1, 2025), https://perma.cc/V6AJ-EMA9; James Comey (@comey), *My Message to the FBI*, Instagram (Dec. 10, 2024), https://perma.cc/W7F7-WLYC; James Comey (@comey), *Every American Should Vote Country over Party in 2024*, Instagram (Oct. 3, 2024), https://perma.cc/32FX-YNAF; James Comey (@comey), *Kamala Harris Made Me Feel Like It's Finally Morning in America.,* Instagram (Aug. 23, 2024), https://perma.cc/RQ45-7FBV.

that "[t]he term '86' is used far more often to mean 'throw out' than to 'kill,' and it appeared at a demonstration that was focused, of all things, on the constitutional impeachment and 'removal' of the President." *Id.* And the court recognized that what "other government officials have asserted" about the meaning of "86" "cannot change the common meaning of the term," which is "most commonly . . . 'to get rid of.'" *Id.* at *18.

Likewise, here, the relevant context shows that no reasonable observer could have viewed Mr. Comey's seashells post as a true threat to the President. Although *Accountability NOW* involved a flag at a demonstration and this case involves a social media post, the bottom line is the same: the phrase "86 47" is "core political speech," not "a threat of violence." *Id.* at *15, 22. Like *Accountability NOW*, this is not "a hard case," and Mr. Comey's post "fall[s] well within the heartland of protected First Amendment speech." *Id.* at *2. This case is therefore "so clear . . . that [it] can be resolved as a matter of law" on a motion to dismiss. *Stock*, 728 F.3d at 298.

**B.      Even If Mr. Comey's Post Could Implausibly And Incorrectly Be Taken As Suggesting Violence, It Still Would Not Be a True Threat**

Even if Mr. Comey's post could be given an implausible interpretation as referencing an act of violence—despite the clear context showing otherwise—the result would be the same. First, in that circumstance, the post would simply amount to political hyperbole, which is protected by the First Amendment and outside the scope of a true threat. Second, the post contains no serious expression that Mr. Comey himself intended to commit violence against the President.

**1.      Mr. Comey's post, even if unreasonably read to imply violence, would be political hyperbole, not a true threat**

Even accepting the government's implausible theory that Mr. Comey used "86 47" to reference violence against the President, any reasonable observer would still recognize the post as political hyperbole. Under controlling precedent, such political hyperbole falls squarely within the First Amendment's protections—and outside the scope of the threats statutes.

16

The foundational precedent is *Watts v. United States*, 394 U.S. 705 (1969) (per curiam). There, the defendant was convicted of threatening the President based on his statement at an anti-war protest that, "[i]f they ever make me carry a rifle[,] the first man I want to get in my sights is L.B.J." *Id.* at 706. The Supreme Court reversed the conviction and held that the case should not have been submitted to the jury because the defendant's statement was not a true threat as a matter of law. *Id.* at 707. The Court reasoned that "the kind of political hyperbole indulged in by" the defendant does not "fit[] within th[e] statutory term" of "true 'threat.'" *Id.* at 708. And it emphasized that "[t]he language of the political arena . . . is often vituperative, abusive, and inexact" without rising to the level of a true threat. *Id.* Thus, the Court concluded that the defendant's "only offense" was a "very crude offensive method of stating a political opposition to the President." *Id.*

The Court applied the same logic in *Rankin v. McPherson*, 483 U.S. 378 (1987). There, the Court found unconstitutional the firing of a public employee "for remarking, after hearing of an attempt on the life of the President, 'If they go for him again, I hope they get him.'" *Id.* at 379-80. In so holding, the Court explained—and the federal government agreed—that the employee's "statement did not amount to a threat punishable under" the federal threats statutes and that it could not "properly be criminalized at all." *Id.* at 387; *see* Br. for United States as *Amicus Curiae* at 8, *Rankin*, 483 U.S. 378 (No. 85-2068) ("[W]e do not think that respondent's remark could be criminalized."). And the Court emphasized again that protected "[d]ebate on public issues . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Rankin*, 483 U.S. at 387 (citation omitted).

In applying *Watts* and *Rankin*, the Fourth Circuit has likewise distinguished between "true threat[s]" and "legitimate political hyperbole or jest." *United States v. Lockhart*, 382 F.3d 447,

17

452 (4th Cir. 2004). To that end, the Fourth Circuit has identified four relevant factors: whether the statement was (1) "made in jest," (2) "to a public audience," (3) involved "political opposition," and (4) was "conditional." *United States v. Vandevere*, 849 F. App'x 69, 70 (4th Cir. 2021) (per curiam); *see Lockhart*, 382 F.3d at 452 (applying the factors).

Here, those factors weigh decisively against finding a true threat. First, like the statement made in jest in *Watts*, Mr. Comey's post indicated that he was not communicating a serious intention to act. His caption suggested that he had encountered a "cool shell formation" on his "beach walk." No reasonable person would think that the former FBI Director was communicating a "serious" threat to kill the President by posting on social media that someone else's arrangement of seashells on a beach was "cool." *Id.*

Second, Mr. Comey's post reached a vast public audience. The "public" nature of the defendant's statement in *Watts*—which he made to a small group at a political rally—counseled against finding it a true threat. *Vandevere*, 849 F. App'x at 71; *see United States v. White*, 670 F.3d 498, 513 (4th Cir. 2012) (finding no true threat where the expression was directed "to the public generally"). Here, Mr. Comey's social media post reached a far broader public audience than the audience in *Watts*—indeed, billions of Instagram users could view it. Thus, it necessarily follows from *Watts* that this factor favors Mr. Comey.

Third, Mr. Comey's post expressed a well-known statement of political opposition to the President. Even the Acting Attorney General has acknowledged that "86 47" is a phrase that "is used constantly" to criticize the President. *See supra* at 14. The phrase is emblazoned on countless products sold on Amazon and eBay, many of which directly link it to impeachment. *See supra* at 5, 14. And in the months before Mr. Comey's post, flags and signs displaying "86 47" were commonly used in protests to call for "the President's impeachment and removal from office."

18

*Accountability NOW*, 2026 WL 1870626, at *17.

Finally, even more than the defendant's "conditional" statement in *Watts*, 394 U.S. at 708, Mr. Comey's post conveyed no immediate intent to take action. In *Watts*, the defendant's statement was "made conditional upon an event—induction into the Armed Forces—which [the defendant] vowed would never occur." *Id.* at 707. Similarly, Mr. Comey's comment—"Cool shell formation on my beach walk"—suggested that Mr. Comey approved of someone else's expression of a political slogan in the benign context of an arrangement of shells on a beach.

No more is necessary for the Court to conclude that the post is not a true threat. But there is more: It is indisputable that, on learning that some people might unreasonably interpret his post as violent, Mr. Comey immediately removed it and posted another public comment stating that he "assumed [his earlier post was] a political message," "didn't realize some folks associate those numbers with violence," and "oppose[d] violence of any kind." *See supra* at 8. As in *Watts*, Mr. Comey's other statements surrounding his post confirm that he was expressing political hyperbole, not a true threat. *See Accountability NOW*, 2026 WL 1870626, at *16 (relying on statement to law enforcement explaining that "8647" meant only that "Trump shouldn't be in office" and that the speaker "want[s] Trump to live forever," while "rot[ting] in jail").

In sum, the factors that the Fourth Circuit and Supreme Court have used to distinguish between political hyperbole and true threats show that Mr. Comey's post falls into the former category. In fact, the Supreme Court has *rejected* true-threats characterizations even when the statement at issue has involved overt references to violence that are absent here: The defendant in *Watts* stated that he would aim a gun at the President, and the employee in *Rankin* stated that she hoped that the President was killed—both explicit references to violence that Mr. Comey's comment lacks. Yet in both cases, the Supreme Court held that the First Amendment barred those

19

statements from "be[ing] criminalized at all."  *Rankin*, 483 U.S. at 387.

By the same token, the indictment here has no precedent.  No authority holds that broadcasting to the world another person's expression of a well-known political slogan with (at most) only an attenuated, obscure, and implausible suggestion of a call to violence can constitute a true threat.  This Court should not be the first to endorse that radical theory.

> **2.  Mr. Comey's post does not convey a serious expression of intent to commit any act of violence**

The indictment also falls short because of its failure to allege another indispensable requirement for a true threat: Mr. Comey's post gives no indication of *his* intent to engage in a violent act.  As the Fourth Circuit has explained, where the defendant did not personally "communicate an intent to take any action whatsoever," no true threat exists.  *White*, 670 F.3d at 513.

*White* illustrates that speech cannot be treated as a true threat unless it communicates *the speaker*'s intent to act.  There, White had posted on a website that a particular person "should be drug [sic] out into the street and shot" and "must be killed."  *Id*.  The Fourth Circuit noted that "[t]hese communications clearly called for someone to kill" the person, but it emphasized that they did not "actually provide[] a threat from [the defendant] that expressed an intent to kill" that person. *Id.*  Thus, the court concluded that the "communications at most conveyed a *serious desire* that [the person] be harmed by others but did not convey a *serious expression of intent* to do harm from the perspective of a reasonable recipient." *Id.* at 514 (emphasis in original); *see*, *e.g.*, *United States v. Landham*, 251 F.3d 1072, 1082 (6th Cir. 2001) (holding that indictment should have been dismissed because the defendant's statement did not convey "an intent to inflict bodily harm").

Mr. Comey's post cannot be read as an expression of *his* intent to commit an act of violence.  Even assuming that "86 47" could be given the "sparse[ly]" used construction of "to

20

kill," Merriam-Webster, *supra*, by no stretch did Mr. Comey's post express *his* intent to harm President Trump. The President's supporters themselves almost universally characterized Mr. Comey's post as "calling for" the President "to be murdered," rather than threatening to harm the President himself. Svirnovskiy, *supra*. As utterly implausible as that interpretation is, it still falls short of amounting to a true threat. And the indictment charges only true threats, not any theory of inciting others to commit violence.[4]

Where the Fourth Circuit has found statements to constitute true threats, those statements overtly expressed the defendant's *personal* intention to cause harm. *See, e.g.*, *Lockhart*, 382 F.3d at 450 ("If George Bush refuses to see the truth and uphold the Constitution I will personally put a bullet in his head"); *United States v. Cooper*, 865 F.2d 83, 84 (4th Cir. 1989) (defendant had "scoped out four areas in D.C. to blow [the Prime Minister's] brains out"); *United States v. Bly*, 510 F.3d 453, 456 (4th Cir. 2007) (defendant mailed "firearms practice targets with bullet holes near their centers" along with the statement "if this remains class warfare, I assure you tragic consequences"). Mr. Comey's post does nothing of the kind. Accordingly, quite apart from the fact that the post depicting an arrangement of seashells into the numbers "86 47" does not imply violence to a reasonable person, the post cannot qualify as a true threat because it does not express any serious intent of Mr. Comey to inflict harm on the President.

---

[4] Any attempt to invoke an incitement theory would be equally unavailing. Under *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), the government may not "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. The Supreme Court has held that even "emotionally charged rhetoric" in speeches that implied acts of violence "did not transcend the bounds of protected speech set forth in *Brandenburg*." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 928 (1982). The government could have no plausible argument that an Instagram post of a seashell arrangement satisfies *Brandenburg*.

## II. BEDROCK FIRST AMENDMENT PRINCIPLES REQUIRE DISMISSAL OF THE INDICTMENT AT THE OUTSET OF THE CASE

The Court should "consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). The Fourth Circuit recently reaffirmed that "the Constitution forbids criminal punishment for protected advocacy," even if it is "inflammatory" or "offensive." *United States v. Al-Timimi*, 164 F.4th 292, 297 (4th Cir. 2026). Whatever one thinks of Mr. Comey's message, the only question here is whether his post is protected speech. Because it is, the indictment must be dismissed. Allowing this case to proceed beyond a motion to dismiss—and forcing Mr. Comey to stand trial for his public opposition to the President—"would give government a broad censorial power unprecedented . . . in our constitutional tradition." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion). And it would "cast[] a chill" over public discussion of our Nation's leaders—"a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our" national values. *Id.*

### A. Prosecution Of Political Advocacy Is Irreconcilable With Our Nation's History and Tradition

In applying the First Amendment, the Supreme Court looks to our national "history and tradition." *Vidal v. Elster*, 602 U.S. 286, 310 (2024). Allowing this prosecution to proceed would be antithetical to that history and tradition. The Founders specifically departed from British law criminalizing speech contemplating the King's death. And since the Founding, Americans have frequently engaged in protected speech criticizing public officials in extreme or violent terms.

Beginning in the fourteenth century, English law made it illegal to "compass or imagine the Death of our Lord the King." John G. Bellamy, *The Law of Treason in England in the Later*

*Middle Ages* 87 (1970); *see* Treason Act of 1351, 25 Edw. 3 Stat 5 c. 2; Note, *Threats to Take the Life of the President*, 32 Harv. L. Rev. 724, 725 (1919). That prohibition was interpreted to include "treason by words," under which "[w]ords themselves were regarded as the overt act of treasons." Bellamy, *supra* at 116. The treason statute was enforced against citizens who made general statements opposing the King—for instance, that the kingdom would have been better off "if the king had never been born." *Id.* at 118. Likewise, a man was indicted for "predict[ing] that the king would 'soon die, with a view to alienate the affections' of the people." *Watts*, 394 U.S. at 709 (Douglas, J., concurring). Prosecutions for "compassing the king's death" thus became a "principal instrument" to "suppress a wide range of political opposition." James Willard Hurst, *The Law of Treason in the United States: Selected Essays* 153 (1971).

The Founders repudiated this British practice. As one court explained, the Constitution rejects "the days of 'constructive treasons,'" when "[m]en were hung, drawn, and quartered for 'imagining' the death of the King." *State v. Van Pelt*, 49 S.E. 177, 181 (N.C. 1904). Specifically, Article III, Section 3 narrowly defines "Treason against the United States" to "consist only in levying War against them, or in adhering to their Enemies, giving them Aid and Comfort." And it omits "any provision analogous to that in English law which punished compassing the death of the king." James Willard Hurst, *Treason in the United States*, 58 Harv. L. Rev. 395, 411 (1945). James Madison explained that Article III, Section 3 imposed "a barrier to th[e] peculiar danger" of allowing "new-fangled and artificial treasons." *The Federalist* No. 43 (James Madison).

Early in the Nation's history, the dangers of allowing government to punish speech critical of public officials became manifest in the Alien and Sedition Acts. The Sedition Act made it a felony to "write, print, utter or publish . . . any false, scandalous and malicious writing . . . against the government of the United States, or either house of the Congress . . ., or the President."

23

Sedition Act of 1798, ch. 74, § 2, 1 Stat. 596 (expired 1801). "[T]he Act was vigorously condemned as unconstitutional," including by Thomas Jefferson and James Madison, and that "attack upon its validity has carried the day in the court of history." *N.Y. Times Co.*, 376 U.S. at 274, 276. "Fines levied in its prosecution were repaid by Act of Congress on the ground that [the statute] was unconstitutional," and President Jefferson "pardoned those who had been convicted and sentenced under the Act." *Id.* at 276. "The invalidity of the Act has also been assumed by Justices" of the Supreme Court. *Id.* Those "views reflect a broad consensus that the Act, because of the restraint it imposed upon criticism of government and public officials, was inconsistent with the First Amendment." *Id.*

Given the adoption of the First Amendment and the Nation's commitment to the freedom to criticize public officials in calls for political change, American citizens have long been free to levy such criticisms in violent language. For example, after George Washington signed the controversial Jay Treaty in 1795, the toast at a Virginia dinner party was to "[a] speedy death to General Washington." Fisher Ames to Christopher Gore, Jan. 10, 1795 in 2 *The Life of John Marshall* 118 (1916). When John Jay returned to the United States after negotiating the same treaty, he "reportedly 'wryly observed that he could have found his way across the country by the light of his burning effigies.'" Eugene Volokh, *Symbolic Expression and the Original Meaning of the First Amendment*, 97 Geo. L.J. 1057, 1061 n.19, 1077 (2009) (quoting John C. Miller, *The Federalist Era 1789-1801*, at 168 (1998)). In 1807, Maryland politician Luther Martin was publicly burned in effigy by angry constituents after he criticized "the federal administration." *Id.* (quoting Albany Register, at 2 (Nov. 24, 1807)). And in 1835, Vice President John C. Calhoun called President Andrew Jackson "a Caesar who ought to have a Brutus" just days before an

24

assassin attempted to take Jackson's life. *The Attempt to Kill "King Andrew,"* U.S. Senate, https://perma.cc/Q37T-FMGR.

Contemporary rhetoric also illustrates this longstanding American practice of using violent terms to criticize political opponents. In 2021, Representative Paul Gosar posted an anime video that depicted him murdering Representative Alexandria Ocasio-Cortez and attacking President Joe Biden. Deirdre Walsh, *Rep. Gosar is Censured Over an Anime Video Depicting Him Killing AOC*, NPR (Nov. 17, 2021), https://perma.cc/E6WQ-9XGX. Likewise, during President Trump's first term, a Missouri state senator posted "I hope Trump is assassinated!" on social media. Karma Allen, *State Senator Who Posted About Trump Assassination Apologizes, But Refuses to Step Down*, ABC News (Aug. 21, 2017), https://perma.cc/97JT-WZH4. And, in response to a Facebook comment asking whether Barack Obama and Hillary Clinton could be hanged, former Representative Marjorie Taylor Greene (while a private citizen) replied: "Stage is being set. Players are being put in place. We must be patient. This must be done perfectly or liberal judges would let them off." Andrew Solender & Jack Brewster, *Marjorie Taylor Greene Signaled Approval for Executing Top Democrats Before Seeking Office*, Forbes (Jan. 26, 2021), https://perma.cc/74P9-WB96.

The President himself has often used this type of rhetoric. Recently, President Trump asserted that a video posted by several Members of Congress criticizing military policy was "punishable by death" and was cause for "hang[ing] them." Ana Faguy & Brandon Drenon, *Trump Says He Was 'Not Threatening Death' to Democrats over Video to Troops*, BBC News (Nov. 21, 2025), https://perma.cc/C8AU-8UFA. During the 2016 presidential campaign, President Trump remarked that if Hillary Clinton were elected, "Second Amendment people" might be the only ones who could stop her. *US Election: Anger over Donald Trump Gun Rights Remarks*, BBC

25

News (Aug. 10, 2016), https://perma.cc/GAV5-8XFG. And while discussing former Representative Liz Cheney, President Trump said: "She's a radical war hawk. Let's put her with a rifle standing there with nine barrels shooting at her, OK? Let's see how she feels about it, you know, when the guns are trained on her face." Sam Cabral, *Trump Says Cheney Wouldn't Be 'War Hawk' if 'Guns are Trained on Her'*, BBC News (Nov. 1, 2024), https://perma.cc/P6NP-5ZSE. As one district court explained when dismissing a threats indictment, if the President may use "coarse" and violent language "from the highest office in the land," then "surely a [private] citizen should likewise be allowed to vent his grievances." *Cook*, 472 F. Supp. 3d at 336-37.

Mr. Comey's Instagram post of seashells spelling "86 47" is far tamer than the harsh and violent political speech that dates to the Founding and has continued through into our modern political discourse. Should it be misinterpreted to invoke ideas about removing President Trump from office by violence, it would fall well within the bounds of our historical tradition of protected political speech. The First Amendment exists precisely to prevent official retaliation against political speech that offends government officials.

B. **The Chilling Effect Of This Unfounded Indictment Reinforces The Need For Dismissal**

Established law requires the dismissal of threats indictments that fail to allege a true threat. *See supra* at 10-11 (citing cases). The need for such a dismissal here is reinforced by the First Amendment principles at stake: This case involves speech critical of the President and thus lies at the core of constitutional protection for the citizenry to speak out in opposition to those in power. Seeking to criminalize such speech casts a pall over public debate and discourages even hardy speakers from contributing to the political marketplace. Our constitutional guarantee of democratic self-government requires that citizens feel free to express themselves through direct, sharp, and even pungent calls for change.

The Supreme Court has thus recognized a "special" judicial "role in marking out the limits of the [legal] standard" in "cases involving restrictions on the freedom of speech protected by the First Amendment." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 503 (1984). That is because "[t]he First Amendment presupposes that the freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Id.* at 503-04. Accordingly, the Supreme Court has "exercised independent judgment" on First Amendment issues, without the ordinary deference afforded to factfinders. *Id.* at 505. And it has approached "with extreme care" any claim of "liability" on the basis of "political rhetoric lying at the core of the First Amendment." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 926-27 (1982)

Here, those principles require dismissal of the indictment as a matter of law. Juries of course find the facts in threats cases when there is room for debate about the character of the charged language. *See White*, 670 F.3d at 512. But that principle does not displace the Court's threshold responsibility to decide whether the indictment fails as a matter of law because to a reasonable listener, the words charged objectively do not rise to the level of a true threat. The many cases dismissing threats indictments for that defect confirm this principle. Especially because First Amendment values are at stake, the Court has a special responsibility to dismiss deficient indictments that suppress speech by their mere pendency. As the President himself has argued when he was a defendant in a criminal case, an "indictment must be dismissed" where it "seeks to criminalize core political speech and advocacy that lies at the heart of the First Amendment." Br. of Donald J. Trump at 4, *United States v. Trump*, No. 23-cr-257 (D.D.C. Oct. 23, 2023), Dkt. 113.

This principle extends across a range of First Amendment settings. For instance, a court

27

can "dismiss a count regarding an obviously non-obscene image." *United States v. Anderegg*, 2025 WL 3126093, at \*7 (W.D. Wis. Feb. 13, 2025).  And in civil cases, courts routinely dismiss defamation and libel claims where the complaint seeks damages based on "constitutionally protected" statements.  *Biospherics*, 151 F.3d at 182 (defamation); *see, e.g.*, *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1091 (4th Cir. 1993) (affirming dismissal of complaint because the challenged article could not "be reasonably read to express the libelous meanings ascribed to it by the plaintiffs"); *McGlothlin v. Hennelly*, 370 F. Supp. 3d 603, 618-19 (D.S.C. 2019) (concluding that challenged "rhetorical statements" "warrant First Amendment protection and that [plaintiff] may not base his claims on these statements").  Because "district courts have as much of a responsibility to police criminal indictments as they do civil complaints," dismissal of the indictment is required here because it likewise challenges only constitutionally protected statements.  *Brewbaker*, 87 F.4th at 572.

A contrary approach would permit the government to chill political opposition merely by filing unfounded charges and imposing the burdens of a trial on someone who engaged in protected speech.  In that circumstance, vindicating one's rights after a trial does not undo the damage because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (citation omitted).  If this Court were to deny Mr. Comey's motions to dismiss, he would be forced to litigate a criminal case and stand trial even though his speech was fully protected.  That would allow the government to use the criminal case alone as punishment.  And "the chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).  Thus, as the Supreme Court has explained, "[a] criminal

28

prosecution under a statute regulating expression" will tend to "inhibit the full exercise of First Amendment freedoms"—both by the defendant and by others who are considering whether to engage in political speech. *Id.* at 486.

That is why the Supreme Court has approved pre-enforcement injunctions to protect "future conduct [that] concerns political speech." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014); *see Mahmoud v. Taylor,* 606 U.S. 522, 559-60 (2025) (stating that "when a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit"). Under that precedent, the *threat* of prosecution for political speech is enough to allow citizens recourse to judicial process to vindicate their right to speak without fear of reprisal. It is all the more necessary to dismiss *actual* prosecutions that would chill individuals from speaking out in the first place—especially through political messages that "occup[y] the highest rung of the hierarchy of First Amendment values." *Snyder*, 562 U.S. at 452 (citation omitted).[5]

***

This case implicates one of our Nation's most cherished guarantees: "no official—'high or petty'—may command our tongues or silence our voices." *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (quoting *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943)). That guarantee flows from the Founders' view "that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth." *Boy Scouts of Am.*

---

[5] In addition to granting anticipatory injunctions against criminal prosecutions, federal courts have sometimes "acted to enjoin pending criminal actions where the enforcement of a statute will involve the chilling of First Amendment rights." *Trueman v. United States*, 2013 WL 12651512, at *1 (E.D.N.C. Sept. 17, 2013); *see, e.g.*, *Dombrowksi*, 380 U.S. at 486-87; *Deaver v. Seymour*, 822 F.2d 66, 69 (D.C. Cir. 1987) (collecting cases). It necessarily follows that federal courts can and should invoke the far-less drastic remedy of dismissing an indictment at the outset of the case where necessary to avoid such a chilling effect.

29

*v. Dale*, 530 U.S. 640, 660-61 (2000) (citation omitted). "[I]t is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions." *N.Y. Times Co.*, 376 U.S. at 269 (citation omitted). The government cannot evade such foundational principles simply by mischaracterizing a political statement as a "threat." Dismissal of the indictment is thus required to protect "the inalienable right of every individual to decide for himself 'how best to speak.'" *Chiles*, 146 S. Ct. at 1021 (citation omitted).

## CONCLUSION

For the foregoing reasons, the indictment should be dismissed with prejudice.

Dated: July 27, 2026                    Respectfully submitted,

JAMES B. COMEY, JR.
By Counsel

*/s/   Joseph Zeszotarski*
Joseph Zeszotarski
(N.C. Bar No. 21310)
Gammon & Zeszotarski, PLLC
P.O. Box 1127
Raleigh, NC 27602
Telephone: 919-521-5878
jzeszotarski@ghz-law.com

*Local Rule 57.1 Counsel for Defendant*

Patrick J. Fitzgerald*
(Mich. Bar No. P86579)
P.O. Box 277
New Buffalo, MI 49177
Telephone: (312) 758-4454
patrickjfitzgeraldlawoffice@gmail.com

*/s/   Ephraim A. McDowell*
Ephraim A. McDowell*
(D.C. Bar No. 1631429)
Alexander J. Kasner*
(Cal. Bar No. 310637)
Elias S. Kim*
(D.C. Bar No. 1673678)
Dev P. Ranjan*
(D.C. Bar No. 90019329)
COOLEY LLP
1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
emcdowell@cooley.com
akasner@cooley.com
ekim@cooley.com
dranjan@cooley.com

Rebekah Donaleski*
(N.Y. Bar No. 4986246)
COOLEY LLP
55 Hudson Yards
New York, NY 10001

31

Telephone: (212) 479-6000
rdonaleski@cooley.com

Michael R. Dreeben*
(D.C. Bar No. 370576)
600 New Jersey Ave. NW
Washington, DC 20001
Telephone: (202) 695-2562

*Special Appearance pursuant to Local Criminal Rule 57.1(e)

Counsel for Defendant James B. Comey, Jr.

32

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 27th day of July, 2026, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/   Ephraim A. McDowell*
Ephraim A. McDowell
*Counsel for Defendant James B. Comey, Jr.*