# AFFIDAVIT OF JOHN GLEESON

State of New York    )

County of New York  )

JOHN GLEESON, being duly sworn, deposes and says:

## I.    SUMMARY OF EXPERT CONCLUSIONS

1. I am a partner in the law firm Debevoise & Plimpton LLP ("Debevoise").

2. Based on the experience set forth below, particularly my years as a federal prosecutor and as a United States District Judge, I am an expert on the topic of the jargon used by members and associates of La Cosa Nostra (which is often referred to, and is referred to here, as the "mafia"). More specifically, my expertise includes the terminology used by such persons to refer to murder.

3. I submit this affidavit in support of Defendant James Comey's motion to dismiss the indictment.

4. The term "86" in any form—numerals, letters, written, spoken—is not part of the mafia lexicon at all, let alone used as a reference to killing someone.

## II.    BACKGROUND AND EXPERIENCE

5. I graduated from the University of Virginia School of Law in 1980, and after a year clerking for the Hon. Boyce F. Martin, Jr. on the U.S. Court of Appeals for the Sixth Circuit, I was an associate at Cravath, Swaine & Moore from October 1981 until I began as an Assistant United States Attorney ("AUSA") in the Eastern District of New York on February 19, 1985.

### A.    Experience with Mafia Jargon as a Federal Prosecutor

6. In April 1985, less than two months after I became an AUSA, I was assigned to assist AUSA Diane Giacalone in the recently-indicted case captioned *U.S. v. Aniello Dellacroce, et al.*, 85-CR-186-EHN. Dellacroce was the Underboss of the Gambino Crime Family of La Cosa Nostra; the remaining nine defendants included Captain John Gotti.

7. AUSA Giacalone and I were the only prosecutors in the case, which involved a protracted pretrial phase in part because there were so many wiretaps and "bugs" that were the subjects of unsuccessful motions to suppress, and then of careful scrutiny by me to cull evidence for use at trial. Wiretaps record conversations occurring over telephones; "bugs" (I will henceforth drop the quotation marks) are secretly-placed listening devices that record direct, in-person conversations.

1

Case 4:26-cr-00016-FL-RN    Document 40-3    Filed 07/28/26    Page 1 of 6

8. The recorded conversations relevant to the words used by mafia members[1] to refer to murder are bug recordings, not wiretaps. The reason: mobsters *assume* their phone conversations are recorded, and as a result they are almost always circumspect, and generally refrain from discussing any serious crime in a telephone call. Bug recordings, on the other hand, are the product of surreptitiously-placed microphones in locations where the targets of investigation feel free to speak openly with one another about their activities.

9. On December 2, 1985, Dellacroce died of natural causes. Exactly two weeks later, John Gotti led a group of about a dozen others in the murder of Paul Castellano, the boss of the Gambino crime family, outside Sparks Steakhouse in midtown Manhattan. Gotti became boss, the *Dellacroce* case became the *Gotti* case, and AUSA Giacalone and I tried that case over seven months, from August 1986 until all defendants were acquitted on March 13, 1987.

10. In the 23 months between being assigned to it and those acquittals, I worked almost exclusively on that *Gotti* case. In preparation for the trial, I listened to and helped to transcribe more than 100 hours of conversations recorded by bugs in the homes of Dellacroce himself in 1985, Castellano in 1983, and Gambino soldier (and best friend of John Gotti) Angelo Ruggiero in 1982.

11. The acquittals in March 1987 were crushing. It was an extremely long and acrimonious trial. John Gotti's lawyers had called a defense witness who testified falsely that I and my wife had tried to suborn perjury from him with narcotics, and that AUSA Giacalone had done the same, except with sexual favors.

12. That experience instilled in me a determination to continue investigating and prosecuting members of the mafia. And that is what I did until I was appointed to the bench in September 1994. Although I occupied various supervisory positions in the office (Chief of Appeals, Chief of Special Prosecutions, Chief of Organized Crime, and Chief of the Criminal Division), I never stopped investigating and personally trying mafia cases.

13. During that seven-year period, I personally tried 13 cases, and I directly supervised the investigations and prosecutions of more than 100 members of the mafia. I was lead counsel in the prosecution of John Gotti in 1992, in which he was convicted of, among many other crimes, five murders and a conspiracy to commit murder. I was also lead counsel in the trial that same year of Victor Orena, the Acting Boss of the Colombo Family, in which he was convicted of, among other crimes, murder and conspiracy to murder.

14. I was also a witness against the defense witness who had accused AUSA Giacalone, me, and my wife of crimes in the first trial, who pled guilty to perjury. I was also a witness at the trial of one of the jurors from that first trial, who was convicted and sentenced to

---

[1] As used in this affidavit, "mafia members" refers to the full range of persons involved in the mafia. They range from Boss, Underboss, and Consigliere (collectively, the "administration"), to capodecinas, or captains, of "crews," to the formally inducted members of the crews (known as "made men" or "soldiers), to men who are not "made" but are associated with the crews ("associates").

2

prison for taking a bribe from the Gambino Family to throw the case. A fuller description of my immersion in the investigations and prosecutions of mafia members is set forth in my book, The Gotti Wars: Taking Down America's Most Notorious Mobster (Scribner 2022).

15. During the period between the two *Gotti* trials, I, the 20 AUSAs who worked under my supervision in the Organized Crime section, and the FBI agents with whom we worked, were determined to record the conversations John Gotti was having with others in the Gambino Family. The efforts to accomplish that were extensive, and they culminated in what became known as the Ravenite bugs. The Ravenite Social Club was at 247 Mulberry Street in the Little Italy section of Manhattan. Previously the headquarters of Aniello Dellacroce, John Gotti took over the club as his headquarters immediately after the murder of Castellano in December 1985.

16. In late 1989 and early 1990, we succeeded in placing three court-authorized bugs in 247 Mulberry Street. The first was in the club itself; the second was in the first-floor hallway just outside the club; and the third was in the small apartment of an elderly woman on the second floor. The third location, which we came to refer to as the Ravenite Apartment, was where John Gotti held secret conversations with his underboss and consigliere. Very few people were aware of that at the time, but one of them happened to be an FBI informant.

17. On five occasions between November 30, 1989, and January 24, 1990, John Gotti had a total of six hours of recorded conversations in the Ravenite Apartment. In those conversations, the administration of the Gambino Family (Gotti, Underboss Salvatore Gravano, and Acting Consigliere Frank Locoscio) spoke freely about the countless crimes in which they and others were involved, including past and future murders. John Gotti also made a threat to murder in the hallway outside the club. The terminology they used to refer to murders is discussed in ¶¶ 29–34 below.

18. In preparation for the 1992 trial of Gotti, I also listened to the bug recordings obtained at the Bergin Hunt & Fish Club in 1986—Gotti's hangout in the Ozone Park section of Queens, New York by New York's Organized Crime Task Force—and culled from those recordings conversations we put in evidence at the trial.

19. A major part of the work of investigating and prosecuting members of the mafia is debriefing those who choose to cooperate with the government. During my decade as a prosecutor, I estimate that I spent more than 500 hours with such cooperating witnesses, learning from them about the innumerable crimes they committed or otherwise knew about. They occupied all the rungs on the organized crime ladder, including dozens of associates and made members from all the Families. They also included consiglieres, underbosses, and the acting boss of one Family.

20. Except for the secretly recorded conversations described above, there is no better way to learn the jargon of the mafia than conducting such debriefings.

21. As described more fully below, there are multiple ways in which they refer to murder, but "86" is definitely not one of them.

3

### B. Experience with Mafia Jargon as a U.S. District Court Judge

22. As referenced above, in September 1994, I was appointed as a United States District Judge, a position I occupied until March 9, 2016, when I resigned from the bench to join Debevoise.

23. My exposure to the jargon used in organized crime continued after my appointment to the bench.

24. For example, I presided over the 2009 extortion and murder trial of Genovese Family Captain Michael Coppola, and over the 2014 murder trial of two La Cosa Nostra associates, Louis Grasso and Richard Riccardi. The evidence at those trials included recorded conversations and the testimony of cooperating witnesses. In addition, on several occasions, the government sought lengthier sentences in other cases based on its allegations that the defendants had committed their crimes as a way of participating in the mafia, allegations it supported in part by reference to informant information and recorded conversations.

25. In addition, during the entire period between leaving the bench and 2022, I worked on The Gotti Wars book referenced above. That process involved not only a thorough revisiting of all the recordings and testimony used in the many trials I and others under my supervision conducted, but also a continuing study of the cases that occurred during the period, as many of them concerned the men and events that were the subjects of the cases I had been involved in.

## III. MY RELATIONSHIP WITH JAMES COMEY

26. As an AUSA, I met James Comey in the early 1990s, as he was prosecuting members of organized crime as an AUSA in the Southern District of New York. New York is the only major city in the country that is divided into two judicial districts, and the United States Attorney's offices in Manhattan, where Mr. Comey worked, and Brooklyn, where I worked, competed with one another.

27. Mr. Comey and I are not friends and never were. Though he and I used the same evidence, including the recorded conversations and cooperating witnesses described below, we competed with each other and had disagreements regarding prosecutorial strategy, including a serious disagreement regarding a multi-defendant murder case that had to be resolved at the highest levels of the Justice Department. To my knowledge, I have not been in Mr. Comey's presence or communicated with him since 1993.

28. Upon learning of the indictment of Mr. Comey, I immediately reached out to his daughter, a lawyer in a firm in New York, to offer my assistance in the event expert testimony regarding mafia jargon relating to murder might be useful.

## IV. MAFIA JARGON FOR MURDER

29. Members of the mafia have various ways of referring to murder.

4

30. "Whack" may be the most popular term for it. In 1992, we convicted John Gotti of ordering the murder of Gambino captain Robert DiBernardo. As Gotti himself put it in the Ravenite Apartment on December 12, 1989: "When DiB got whacked they told me a story. I was in jail when I whacked him." Similarly, when talking to Gravano and others on January 24, 1990 about Gotti's desire to murder Gaetano "Corky" Vastola, Gotti told Gravano to "whack this fuckin' kid." And a Sicilian mafia member who had cooperated in a case in the Southern District of New York "gotta get whacked," Gotti fumed on January 4, 1990.

31. Indeed, that term for murder was ubiquitous, to the point where even prosecutors and agents routinely used it. It is the universal term for killing someone in the mafia. In preparing this affidavit, I reviewed my book and saw that I had used the word more than 50 times myself.

32. But there are other terms and phrases mafia members use when they speak of murder. Sometimes they just say "kill." For example, Gotti told Gravano and acting consigliere Frank Locascio that he would send out a feeler to Castellano's lawyer to ask him to represent Gotti, and added that if he said no, "I'll kill him." He reminisced about Gravano having asked for "permission to kill" Louis DiBono. And in a rare reference to murder on a wiretap—on the phone at the Bergin Hunt & Fish Club in 1982—a furious Gotti screamed at Tony Muscatiello that if he ever failed to return Gotti's call again, "I'll fuckin' kill you!"

33. Gotti also referred to murders he had committed in the past as "pieces of work," although few others used that phrase in my experience. Similarly, he repeatedly stated in recorded conversations that Paul Castellano "got sick," an obvious reference to having been murdered, but in my experience, Gotti was alone in using that terminology. Sometimes he got graphic: when Gambino soldier Peter Mosca reported to Gotti in the Ravenite hallway that a Greek gangster had opened a gambling game in direct competition with a Gambino game in Astoria, Queens, Gotti instructed Mosca to "tell him that I, me, John Gotti, will sever his motherfucking head off."

34. "Clip" is a popular synonym for murder in the mafia, and in my experience, was nearly as ubiquitous as "whack." Numerous cooperating witnesses referred to murder victims as having been "clipped" for one reason or another. And their use of the word "kill" was also common. The word "hit" is also used on occasion, although that term, in my experience, is used more by law enforcement than mobsters themselves, and the latter do not, in my experience, ever refer to killers as "hit men."

## V.  EXPERT CONCLUSIONS

35. I understand that a central allegation in this case is that "86 47" is, according to the government, something "a reasonable recipient who is familiar with the circumstances would interpret as a serious expression of an intent to do harm" to a person.[2] And I

---

[2] DEPARTMENT OF JUSTICE – OFFICE OF PUBLIC AFFAIRS, *Federal Grand Jury Indicts Former FBI Director James Comey for Threats to Harm President Trump*, Apr. 28, 2026,

5

further understand that that accusation is based on the assertion that "'86' is a mob term for 'kill him,'"[3] and that when a mob boss orders a murder he says "86 'em"[4] or "Six 'em."[5]

36. The claim that "86" is mafia jargon for "kill" is preposterous. If it weren't made in the context of seeking to deprive a man of his liberty, it would be laughable.

37. I have never come into contact with a single recorded conversation where a mafia member uses "86" in any way, shape, or form, let alone to refer to killing or murder. Nor have I come into contact with any such reference to "86" in my thousands of hours of debriefings and conversations with cooperating witnesses in mafia cases.

38. In short, in my expert opinion, there is literally no support for the central allegation on which the case rests.

Further affiant sayeth not.

This the 23rd day of July, 2026.

_____
John Gleeson

Sworn and subscribed to me
This the 23rd day of July, 2026.

_____
Notary Public

My Commission Expires:
April 10, 2030

HIROKO HARA
Notary Public, State of New York
No. 01HA6143515
Qualified in New York County
Commission Expires April 10, 20 3 0

---

https://www.justice.gov/opa/pr/federal-grand-jury-indicts-former-fbi-director-james-comey-threats-harm-president-trump.

[3] @realDonaldTrump, Truth Social (Apr. 29, 2026, 11:35 P.M.), https://truthsocial.com/@realDonaldTrump/posts/116491559257751897.

[4] REUTERS, *Trump says he considers '86' to be mob slang after Comey indictment*, at 0:17 (YouTube, Apr. 29, 2026), https://www.youtube.com/shorts/d1aVKX-Kdjk.

[5] RUDOLPH GIULIANI, *America's Mayor Live (672): James Comey Digs Deeper Hole with Explanation of 86 Social Media Post*, at 1:29:16 (YouTube, May 20, 2025) https://www.youtube.com/watch?v=Fu6TCh4YbWI.

6