IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Case No. 4:26-CR-00016-FL-RN |
| | ) | |
| James B. Comey, Jr., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**AFFIDAVIT OF PATRICK J. FITZGERALD IN SUPPORT OF
MOTION TO DISMISS FOR VINDICTIVE AND SELECTIVE PROSECUTION,
MOTION TO SUPPRESS AND FOR *FRANKS* HEARING, AND
<u>MOTION FOR DISCLOSURE OF GRAND JURY PROCEEDINGS</u>**

COMES NOW, Patrick J. Fitzgerald, being first duly sworn, and deposes and states as follows:

1.      I represent Mr. Comey in this matter.  I have reviewed the substantial discovery provided by the Government and submit this affidavit to outline certain relevant portions of that discovery in a manner that protects: (i) the privacy interests of Mr. Comey and his family; (ii) the privacy interests of a potential witness; and (iii) the identity of certain personnel of the United States Secret Service whose conduct is addressed in the accompanying motions and also protects the Secret Service code name for President Trump.  This affidavit also summarizes certain materials provided by the Government in discovery or obtained by the defense that are voluminous or are otherwise unwieldy.  Some of those materials are summarized in a timeline fashion for easier comprehension.[1]

---

[1] Even where documents are not attached, I note the last six digits of their Bates numbers for the record, and for reference by the Government. We are prepared, of course, to provide any such documents or items (such as audiotapes or images) under seal to the Court if the Court would find it helpful.

2. The documents discussed herein concern the following facts at issue in the accompanying motions:

a. The circumstances of the law enforcement interview of Mr. Comey on May 16, 2025 and his wife Patrice Comey on May 17, 2025;

b. The circumstances of the law enforcement interview of a person ("Person-1") cited in the applications for the search warrants at issue;

c. The chronology of the Government's efforts to review its databases regarding Mr. Comey's purported exposure to the term "86" and the interview of witnesses about the same topic;

d. The results of defense inquiries about a certain FBI database and the results from a Rule 17(c) subpoena;

e. The circumstances around the Government's review of two privileged conversations between Mr. Comey and his counsel; and

f. The timeline of the appointment of the Assistant United States Attorney who was the lone signatory on the indictment.

<u>Tracking and Surveillance of Mr. Comey</u>

3. On May 15, 20205, after Mr. Comey posted a photograph of someone else's seashell arrangement spelling out "8647," a woman approached the house where Mr. Comey was staying, shouting and gesturing profanely. Mr. Comey left a voicemail for the local police chief at 8:00 pm to notify him about the controversy over his post. [000775]

4. Mr. Comey was telephonically interviewed by the United States Secret Service ("Secret Service") on the evening of May 15, 2025. Ex. A. [012061] The Secret Service agent who interviewed him sent an internal email at 9:46 pm reporting he "just spoke to James Comey

on the phone a few minutes ago." [012761] After relaying the substance of the interview, the agent noted that Mr. Comey "agreed to meet with the USSS tomorrow afternoon once he gets home from the beach. He confirmed his residence and agreed to give us a telephone call if he was going to be later because of traffic. We agreed to 3 pm at his residence if this telephonic interview was not sufficient." *Id.* Documents show that at 11:39 pm that evening, an executive summary of the interview was provided to various Secret Service personnel, including Special Agent in Charge ("SAIC") John Bush, who headed the Presidential Protective Division and was traveling overseas with President Trump. Ex. B. [014194] A Deputy SAIC requested the update because the SAIC was "expecting to have to brief POTUS. He has since briefed the Chief of Staff on the below updates…." *Id.* Discovery also reveals that the Secret Service agents working on the investigation were aware of statements being made in the media that evening, "to include posts from FBI Director Patel as well as Trump JR." Ex. C. [013310]

5. Discovery reveals that the next day, the Secret Service conducted both physical surveillance and electronic surveillance of Mr. Comey (namely, the real-time tracking of his cellphone's location) as Mr. Comey and his wife drove from North Carolina home to Virginia, where he was to be interviewed a second time. The Government obtained no warrant or court order for the electronic surveillance. On May 15, 2025, a SAIC from the Secret Service inquired of an Assistant to the Special Agent in Charge ("ATSAIC") how quickly they could "ping" Mr. Comey's telephone "via exigency" if necessary. Ex. D. [013416][2] The ATSAIC responded that it could be done quickly but that:

> [I]t was a bad idea. To declare an exigency exemption, we needed
> to believe that there is an imminent threat to life or limb. At that time

---

[2] Given that the conduct at issue could be the subject of further investigation, in an abundance of caution we have redacted the names of the personnel involved but retained their titles. We have also redacted a code name for President Trump contained in the document.

> we did not believe that anyone's life was in immediate danger and
> legally it was a bad idea to ping the phone.

*Id.* The SAIC responded that he agreed with the analysis that pinging the phone was "legally questionable" but indicated "we might anyway." *Id.*

6. The following morning, the Secret Service submitted an emergency request to Verizon in which an agent represented that such surveillance "relate[d] to an emergency involving danger of death or serious physical injury to a person, necessitating disclosure without delay of information relating to that emergency." Ex. E. [013475-77] The Secret Service agent who completed the form signed an attestation stating: "I certify that the foregoing is true and correct and understand that Verizon may rely upon this form to make an emergency disclosure to my law enforcement agency … pursuant to 18 U.S.C. 2702(b)(8) or 2702(c)(4)." *Id.* The declarant advised the ATSAIC that he "was asked by the SAIC to ping the cellphone of James Comey via exigency." Ex. D. [013417] He further added that he did so "with hesitation." *Id.* The same document indicates that an Assistant Special Agent in Charge ("ASAIC") reported that "the # 3 guy at DOJ 'wanted to ping the cellphone via an exigency request.'"[3] *Id.*

7. Secret Service case records provided in discovery show that Mr. Comey's cell phone was electronically tracked that day as he and his wife drove north on Interstate 95 ("I-95") from North Carolina toward his Virginia home. The Comeys were also physically surveilled during the trip, but trailing agents lost contact when the Comeys exited I-95 at one point to drive toward the cemetery where the Comeys' son is buried. The electronic surveillance captured the trip to the cemetery. (The Government later seized—pursuant to the challenged March 2026

---

[3] I understand that the Associate Attorney General is typically referred to as the "number three" at the Department of Justice. Public records indicate there was no one in that official position in either a confirmed or acting capacity at that time.

search warrant—a photo Mr. Comey took of the flowers at his son's grave that day.)  The electronic tracking continued for the remainder of the Comeys' trip, including their return to I-95, where the physical surveillance resumed as well.  Because of the privacy interests of the Comeys in both the location of their home and the cemetery plot as well as personal photos, we have not attached the exhibits but can provide them to the Court under seal if necessary.[4]

The Secret Service Interview of Mr. Comey on May 16

8.　　　Once he returned home, Mr. Comey was transported to Secret Service headquarters in Washington to be interviewed.  Prior to the interview that day, multiple Secret Service documents reflect that President Trump wanted a summary of the interview when available.  For example, at 12:03 pm on May 16, 2025, SAIC Bush emailed from Air Force One:

> Staff has been advised that Mr. Comey may be interviewed today, in person, at WFO.  As I am getting LOTS of questions, is it possible for me to get an immediate readout (call) of the interview?  We are en route to the refuel in the UK and then another 7 hour flight to JBA[5].   I am available via cell.

Ex. B.  [014136]  At 12:07 pm, a Secret Service supervisor responded to SAIC Bush that he would "ask for the preliminary interview notes as soon as they are available."  Ex. B.  [014135]  In a separate document containing a timeline for the day, it was noted at 12:15 pm that "POTUS was requesting a copy of the interview notes to use in his 6 pm press conference."[6]  Ex. D.  [013417]  At 12:33 pm, SAIC Bush responded that "It is a hot topic on the plane and [redacted code name for President Trump] is very interested." Ex. B. [014134]  There were several more updates to SAIC Bush that afternoon as to the time and location of Mr. Comey's interview, and then SAIC

---

[4] The documents summarized here are: 013232-40 and 013315 through 013401.

[5] I understand "JBA" to be a reference to "Joint Base Andrews." the home destination of Air Force One.

[6] President Trump was interviewed that day by Brett Baier for Fox News' "Special Report with Brett Bairer" which airs in the 6:00 pm time slot.  Mr. Comey's May 16, 2025, interview had not been completed by that time, but his May 15, 2025 interview had been completed and a summary had been shared with SAIC Bush.  Ex. B.  [014194]

Bush asked about any further updates noting "the COS just asked me."  Ex. B. [014133]  In addition, it was separately reported that an ATSAIC was contacted by the Protective Intelligence Operations Center who "claimed that they received a request from SAIC Bush who received a direct request from [Secret Service code name for the President] for a summary of the interview when available."  Ex. F. [013197]

9.      Mr. Comey was represented by counsel, David Kelley, Esq., who participated by telephone from New York.  Mr. Comey's interview was attended in person by the General Counsel for Homeland Security, the General Counsel for the Secret Service, a Deputy Chief Counsel for the Secret Service, an Assistant U.S. Attorney from the Eastern District of Virginia, an ATSAIC from the Secret Service and a Special Agent from the Secret Service.  Ex. A. [012061]  As documented by the Secret Service: "Mr. Comey presented a professional appearance, was eager to speak and agreed to the consensual conversation.  He answered all questions posed to him, and his attorney never stopped the interview."  *Id.*.  The interview was approximately 45 minutes long, ending at 6:34 pm.  Ex. A. [012062]  At 9:29 pm, an executive summary of Mr. Comey's interview was sent to SAIC Bush on Air Force One. Ex. B. [014161]

10.      Following the interview, an ATSAIC who worked on protective intelligence ("PI") and who led Mr. Comey's interview wrote an email to a group of Secret Service personnel including the Special Agent who submitted the declaration to Verizon discussed in paragraph 6 above:

> We wrapped up the Comey interview a short while ago and I wanted to take a moment to thank everyone for your contributions last night and today.  Just like we often do in PI, we were tasked with coming together to put out a fire and deal with PI-related issues that have/had political and far-reaching consequences.  You all contributed, some in non-traditional ways, to this issue being resolved in a professional and efficient manner. Thank you for your dedication and willingness to step up and help each other out.  This

incident will constitute a story that we will be telling the rest of our careers.

Ex. G. [013423]

<u>The Secret Service Interview of Patrice Comey on May 17</u>

11.     Patrice Comey was interviewed for eleven minutes the following day, May 17, 2025, during a telephone call that was not recorded.  Ex. A [012062]  During that interview, she explained that from her prior work in the restaurant business she understood "86" to mean to be out of an item ("like we're 86 on broccoli") or to discard an item in a non-violent manner.  *Id*.  Ms. Comey related that following Mr. Comey's post, Person-1 had contacted her to advise her that the post was being viewed by some as a call to violence against President Trump.  "Since that had not occurred to her, she googled the numbers '8647' and learned that it could be interpreted in a violent manner."  *Id*.  She immediately told Mr. Comey, who deleted the post.  *Id*.  Ms. Comey also stated that she and her husband "are not violent people and wish no harm would come to anyone."  *Id*.

<u>The Secret Service Interviews Person-1</u>

12.     Person-1 is the individual who corresponded by text with Patrice Comey shortly after the allegedly threatening Instagram post and whose statements were a central part of both challenged search warrant applications.  The Secret Service interviewed Person-1 by telephone on May 17, 2025, and in person on May 21, 2025, in a recorded conversation.  Ex. H.  [012475]  Person-1 stated that they had not spoken to Mr. Comey in two or three years.  Ex. H.  [12475]  Person-1 also stated that they had just blocked Patrice Comey's telephone number after their May 15 conversation.  Ex. H. [012474]  Person-1 also expressed disagreement with the role of Mr. Comey's son-in-law prosecuting crimes committed on January 6, 2021 at the U.S. Capitol.  Ex. H. [012475]  Person-1 expressed regret to the agents that they did not have "something more" to make the Comeys "face consequences for this."  Ex. H. [012476]  They added "I guess there's nothing

that I can share that isn't just speculation on my part, right?"[7]  *Id*.  They further advised the agents

that they told Patrice Comey that "I hope Jim goes to jail" for alleged "crimes he committed" as

FBI Director.  *Id*.

13.     Person-1 stated that they were familiar with the term "86" from its restaurant

context.  A one paragraph summary by a Secret Service agent of the May 17, 2025 interview

(which was 7 minutes long and not recorded) reported that Person-1 said that while they were

familiar with the term "86" from their own experience in the restaurant industry, they "immediately

perceived" the "86 47" post as a call for violence against President Trump due to Mr. Comey's

career in law enforcement.  Ex. A. [012062]  In the recorded May 21 interview, a more detailed

explanation was provided:  they stated that their first reaction to the seashells post was a benign

one associated with prior work in restaurants:[8]

> …my first initial thought was personally, I thought that the only way
> that I really heard 86 in my life before is when I used to work in
> restaurants in college and its like… out of something on the menu,
> you know, 86 or not the menu whatever.

Ex. H.  Person-1 then made clear that their perception changed as they thought more about the

seashells and took into account other information outside of that post, including the inability of the

Democrats to impeach President Trump, given Republican control of Congress.  In particular,

Person-1 said they had listened after the fact to a media appearance by Rudolph Giuliani prior to

the May 21 interview during which Mr. Giuliani said that Mr. Comey had worked on "specific

mob cases" where "they had several logs of videotapes and stuff and phone calls saying, you know,

we gotta 86 this guy." [012474]  Person-1 then stated: "That's why I eventually reached out.

because I thought there was no shot in hell that this man who spent his life doing all the things that

---

[7] Person-1 elsewhere described some of their thoughts as "conjecture."  Ex. H. [012474]

[8] They indicated that the restaurant interpretation was "My first initial thing, the only way I ever heard it…." and it
meant "out of something on the menu."  Ex. H. [12474]

he's done up to this point, prosecuting mob families in New York … there was no way he didn't know how that was at least going to be interpreted by most people." [012475] Person-1 came to the conclusion that the seashells post constituted a "call to violence," although they did not suggest the post was a threat by Mr. Comey to carry out violence himself. [012473]

The Giuliani Statements

14. Mr. Giuliani discussed the seashells post in a May 20, 2025 episode of his online show, "America's Mayor Live," the day before the May 21, 2025 in-person interview of Person-1.[9] Mr. Giuliani claimed that Mr. Comey had worked on specific organized crime cases where the term "86" was used to mean "kill." Mr. Giuliani, who became famous for his own role in organized crime prosecutions, admitted that day during a separate Newsmax interview that he himself did not understand "86" to mean "kill" until he was "educated" by others:

> I'll gonna tell you the truth. If I saw it, I didn't know what it meant until my boys told me. If I saw that, I would have rubbed it off with my feet. I thought it was a license plate number or something. Or somebody's PIN number. ….

https://www.youtube.com/watch?v=zXuX3qbqbMo (starting at time stamp 2:35).

15. On May 21, 2025, an Assistant United States Attorney ("AUSA") in the Eastern District of North Carolina ("EDNC") wrote to a Secret Service agent that "I've been ordered to open this case in EDNC." Ex. A. [012063] Thereafter, over the course of October and November 2025, the EDNC closed out the investigation of Mr. Comey's seashells post it was conducting with the Secret Service. [12809] On October 30, 2025, the Charlotte office of the FBI opened a full investigation of the same subject matter. Exs. J; K. [000055; 005801] The Secret Service files

---

[9] Mr. Giuliani said: "He's guilty as hell… This isn't the first time [Comey] was exposed to this. As the enterprising reporters on Newsmax, I think it was Finnerty who did this, pointed out in both the Salerno case and the Gotti case, that expression 86 was used on tape, for killing people. "Six 'em," "86 'em,' whatever. So it's not the first time he saw that." https://www.youtube.com/watch?v=Fu6TCh4YbWI (starting at timestamp 1:28:33).

were provided to the FBI in November and December 2025.  Exs. L; M. [005806, 005833].

The FBI Interviews Person-1 in April 2026

16.    The FBI case agent, together with the EDNC First Assistant U.S. Attorney and another FBI agent, travelled to interview Person-1 on April 13, 2026.  Ex. N.  [005889].  This interview two weeks before the indictment was apparently the first time the FBI interviewed Person-1.  The interview was recorded and lasted approximately 27 minutes.  When asked their "first thoughts" on seeing the Instagram post, Person-1 responded:

> I'm tired of hearing about Jim… But in reality that probably originally was my first thought.  But when I saw it, I quickly went through in my head like the term "86" to me that I am familiar with in my own life is in a restaurant right like when "something's off the menu"… it's "86'd" … you don't serve it any more but pretty quickly my mind went to… I know he wasn't trying to take Trump off the menu but if he was, like what would that mean, right, how would you get rid of "47" right now with both houses of Congress or Congress and the Senate being under Republican control?  It couldn't have been impeachment, it couldn't have been all these things…
>
> So like I just thought that there was a clear implication, whether a joke or whether you know trying to be sly that my perception was very quickly that well certainly Jim, coming up from you know his time in the Southern District of New York, being the district attorney there and prosecuting mob boss cases…that we have to know what that means and so it had to be something along those lines…were my initial thoughts as I can best recollect them now.

Ex. O. [Bates M10 audiotape]

17.    Later in the interview the case agent reminded Person-1 about the prior Secret Service interview:

> Agent: You said that after the fact so after you had time to reflect on what you thought the post had meant that you heard Rudy Giuliani give an interview about Comey's post.  And that Giuliani referenced specific mob cases that Comey worked on when he was a prosecutor in New York, and that there were several logs of videotapes and phone calls where the mobsters were saying 'we've got to 86 this guy.'  Do you remember?

> Person-1: I don't recall that specifically but also could be where
> what I just said about where 86 came from…. I believe that is true
> if I said it but I don't remember that specifically.

*Id*.

18. At no time during the interview was Person-1 advised that the claim that there were "specific mob cases" on which Mr. Comey worked where "86" appeared on tapes and logs was inconsistent with the FBI's records and investigation to date.

19. During the interview, the case agent reminded Person-1 that they had expressed a concern to the Secret Service that Mr. Comey's public explanation that Patrice Comey interpreted "8647" in light of her restaurant experience was made up after the fact for purposes of media appearances. The case agent stated in response: "And then of course, they go on these shows and then all of sudden the '86' restaurant [story][10] comes out." *Id*.[11] The documents show that at the time of the interview, the case agent had access to the following materials concerning Patrice Comey: (i) the report of the May 17, 2025, Secret Service interview of Ms. Comey described in paragraph 11 above, in which she referenced her prior restaurant experience ("like we're 86 on broccoli"); and (ii) a copy of the Internet search Ms. Comey conducted at 3:12 pm on May 15, 2025, shortly before her husband's post, which referenced the usage of "86" in restaurants and bars.

20. Earlier that day, prior to the recorded interview, Person-1 transmitted to the case agent screen shots of their text exchanges with Patrice Comey. During the interview, the case agent asked Person-1 to scroll through their telephone to make sure that they had sent the case

---

[10] Person-1 and case agent talked over each other at that point, with Person-1 saying "that story."

[11] Mr. Comey's first media appearance, in connection with the release of his book "FDR Drive," was Monday, May 19, 2025. *James Comey is back in Trump's crosshairs. This time, it's different.* By David Rohde, NBC News, May 20, 2025, at: https://www.nbcnews.com/politics/justice-department/james-comey-back-trumps-crosshairs-time-different-rcna207635.

agent all the text exchanges with Patrice Comey. Person-1 did so then and there and while doing so observed: "I thought that was weird sending me an Amazon picture of an 8647 shirt." Ex. O. [M10 audio] Elsewhere during the interview, Person-1 noted that Patrice Comey had sent them a "screenshot of what people on the right were saying." *Id*. The FBI thus received multiple copies of the text messages reflecting Google searches that Patrice Comey sent in response to Person-1's 5:52 pm EST text asserting that Mr. Comey's seashell post was a call to violence in addition to the copies the Secret Service previously obtained in 2025. Those included a 5:57 pm EST text that attached a partial screen shot of an Internet search reflecting "8647 Anti-Trump Funny T Shirt." Exs. P; Q; R. [006077, 007480 and 012441] The FBI also captured multiple copies of a 6:05 pm EST text that included the language: "Now that you said what you said and I googled and saw the right wing narrative about the numbers" and included part of a screenshot of an Internet search reflecting a "Newsmax" posting. Exs. P; S; T; U; V; W. [006080, 006082, 007481, 007482, 012147, 012442, 012443] I attach a redacted copy of that text. Ex. P. [006080][12]

21.     Although Person-1 indicated a belief that Mr. Comey's post may have been a "call for violence," at no point did Person-1 express a belief that Mr. Comey was personally threatening to assassinate President Trump. At the end of the interview, Person-1 mentioned that they had left a prior career after they went to "rehab." Ex. O [M10 audio] No follow up questions were asked during the recorded interview about what led to the need for rehabilitation and whether those issues remained.

<u>The Government's Review of Its Files and Other Sources Regarding "86"</u>

22.     In September 2025, at the request of an EDNC AUSA, the FBI searched its Sentinel system—a database of all FBI investigations and information going back decades—for the purpose

---

[12] The exhibit is redacted to protect Person-1's identity.

of determining whether Mr. Comey was exposed to a violent interpretation of the term "86" at the FBI:

> FBI Charlotte Field Office conducted logical search inquiries to the best of its abilities. The search was conducted within the FBI's Sentinel database system. This included multiple spellings and variations of the slang term "86" or "eighty-six," including limiting phrases and time frames to help narrow search returns. Charlotte believes that any references to search returns, including cases and training materials, would be stored within Sentinel.
>
> These searches produced inconclusive results regarding the use of "86" or "eighty-six" as a slang term. Additionally, the searcher was unable to determine if the subject would have had access or been exposed to any potential files meeting the search parameters.

Ex. X. [000070]

23.     In November 2025, at the request of the case agent, the Government reviewed the case file of *United States v. John Gambino*, the organized crime case Mr. Comey tried as the lead prosecutor in the Southern District of New York over the course of six months in 1993.  The case file contained no references to the term "86."[13]

24.     The Government also obtained a transcript related to *United States v. Salerno*, an organized crime trial in New York prosecuted by the United States Attorney's Office for the Southern District of New York under then-U.S. Attorney Rudolph Giuliani. That transcript also contained no references to the term "86." [007715]

25.     Beginning on April 14, 2026, at the direction of the First Assistant U.S. Attorney and the case agent, the FBI did key word searches of the trial transcripts from *United States* v. *John Gambino* for references to "86," with negative results reported on April 23.  Ex. Z; AA. [003888; 005896]

---

[13] The searches of the case file appeared to have been conducted around November 20, 2025, at the direction of a then EDNC AUSA and "did not yield any relevant returns." Ex. Y [005829, 5830].

26. On April 27, 2026 (the night before the indictment), the FBI was directed by the case agent to conduct the same search again across an additional transcript from the *Gambino* trial with similarly negative results reported on April 30. Ex. BB. [007593]

27. On May 6, 2026, the case agent telephonically interviewed two former FBI agents about the term "86." The first retired agent, who had worked organized crime cases in New York and was specifically assigned to the FBI squad that investigated the Gambino crime family, reported that he: "was familiar with the term '86' and used it and heard others use it throughout his life. [He] never understood the term '86' to mean to kill. [He] did not recall any instances in which he heard organized crime subjects or sources use '86' to mean to kill someone." Ex. CC. [007626]

28. The second retired FBI agent had worked organized crime cases in New York for a "very long time." He worked at the FBI for about thirty years and was the "last surviving member" of the squad dedicated to investigating the Gambino crime family. He did not indicate any instance where "86" was used in the organized crime context to mean "kill." He understood the term to be used by organized crime to mean "get rid of things." He said he would look around some more and opined that it is possible the mob used "86" to mean "kill" but that confidential sources did not use that term with the FBI, speculating that perhaps they refrained from doing so to keep the FBI from learning its meaning. Ex. DD. [007627]

29. The following day, May 7, 2026, at the personal direction of the United States Attorney for EDNC, the FBI conducted both open-source queries and artificial intelligence searches—namely, on Google AI and ChatGPT—about the term "86." Ex. EE. [007623] The search yielded varying results, including one that stated: "Many career law enforcement officials, including former FBI agents, have publicly disputed this, stating they never heard "86" being used

for murder in 35 + years of duty, considering it purely a restaurant or bar item for removal." Ex. FF. [007580]

30. Another search returned a document indicating that the Merriam-Webster dictionary does not officially enter a violent meaning for "86" because "it is relatively recent and lacks widespread use compared to its hospitality meanings." Ex. GG. [007576] That same query also generated the following statement:

> There is an urban legend that the term originated from mobsters burying bodies "8 miles out and 6 feet under." While experts at the Mob Museum state there is no documented evidence that the term began with organized crime, it has been used metaphorically to mean "eliminate" in crime fiction and film.

31. That same day, the United States Attorney made a direct request to the Special Agent in Charge of the FBI's Charlotte office for a search of the social media accounts of Mr. Comey and Patrice Comey for uses of the term "86," with negative results. Ex. HH. [007608]

32. On May 8, 2026, the case agent had a telephone conversation with Salvatore "Sammy the Bull" Gravano, the former Gambino crime family underboss who was one of the cooperating witnesses at the *United States v. John Gambino* trial.[14] During the telephone conversation to discuss the logistics of his forthcoming interview, Mr. Gravano stated his belief that Mr. Comey had to know what the term "86" meant "as it related to killing someone." Ex. II. [012166] Gravano also stated that he was "fairly certain it would be difficult to find the term '86' documented in law enforcement/FBI files because members of organized crime families refrained from using terms such as '86' that were commonly used in day-to-day business in the presence of

---

[14] Mr. Gravano's racketeering guilty plea in 1992 included his admission to participation in nineteen murders. Mr. Gravano also admitted to bribing a juror at John Gotti's first racketeering trial. After he completed his sentence in 1995, Gravano left the Witness Protection Program. He was later convicted in 2002 on both federal and state charges for his participation in a narcotics conspiracy in Arizona with his wife, son and daughter among others. He was released from prison in 2017 and is currently on parole. He is now a podcaster.

law enforcement officers." *Id*. On May 13, 2026, the First Assistant U.S. Attorney and an FBI agent traveled to Gravano's home to interview him. During the recorded interview, which lasted 25 minutes, Gravano said that "86" generally means to "get rid of" and to him, as a "gangster," it means "to kill." Ex. JJ. [M12 audio] Gravano did not recall discussing the term "86" with Mr. Comey during the *Gambino* trial or meetings in preparation for the trial. *Id*. Gravano noted that "it certainly wouldn't be brought up by me." *Id*. When asked for names of prosecutors who would be good for the government team to ask, Gravano described John Gleeson as a former prosecutor and judge who was "brilliant." He added that an opinion "coming out of his mouth would be unbelievable." *Id*. While Gravano claimed that the post was a call for violence against President Trump ("let's kill Trump"), Gravano did not claim Mr. Comey's seashell post to be a statement threatening that Mr. Comey would personally kill President Trump.

The FBI Threat Database

33. In 2007, the Behavioral Analysis Unit ("BAU") at the FBI created a Communicated Threat Assessment Database ("CTAD"). CTAD was transferred from the BAU to the Questioned Documents Unit in 2012 and thereafter called the Communicated Threats Database ("CTD"). Ex. KK. [012771] Documents that were sent to the FBI lab for analysis, including documents from other agencies, were included in the database. *Id*. Mr. Comey's defense requested from the government the number of threats in the database prior to Mr. Comey's May 2025 indictment that contained the phrase "86." I have been advised by the First Assistant that the answer is zero.

The Secret Service "Non–Referred" Case Policy

34. When the Secret Service investigates an alleged threat, it differentiates between "referred" matters and "non-referred matters." Pursuant to internal Secret Service policy, a matter can be deemed "non-referred" (which still requires investigative steps to be taken) where "the

determination can be made based upon initial investigation that there is no risk of an unwanted outcome and there is no judicial outcome." Ex. LL. [014105] The investigation of Mr. Comey was treated as a "non-referred" matter. Ex. I. [012775]

<u>The May 16, 2025, Change in Secret Service Policy</u>

35. On May 16, 2025, during the morning program "Fox and Friends," a clip was played of a portion of President Trump's interview by Brett Baier the prior evening. During that clip, which aired beginning at 8:12 am Eastern time, President Trump was quoted as saying of Mr. Comey:

> He knew exactly what that meant. A child knows what that meant. If you're the FBI Director and you don't know what that meant. That meant assassination and it says it loud and clear. … He's calling for the assassination of the President.

Roll Call, *Interview: Bret Baier of Fox News Interviews Donald Trump in Abu Dhabi – May 16, 2025*, https://perma.cc/KTP2-U4DL.

36. Discovery documents establish that at 10:33 am that same morning, the Secret Service changed its policy regarding the treatment of the phrase "8647":

> Effective immediately, please include "8647" in manual keyterm searches for threats to POTUS      Trump….
>
> "8647" could be coded threat language for "kill the 47th President"…
>
> The language itself could constitute a threat and it also could constitute unusual behavior. …
>
> It is understood that we will be in for a surge of discoveries/reports. Please keep management informed and we will help manage the surge. The front office, CPS and RMB are all aware of this.

Ex. B. [014115-16]

37. By the end of the day, the policy was rolled back. At 11:12 pm, an Assistant Director wrote:

I appreciate the team's effort on this. As we figured, this is a lot and we can't, nor should be expected to document all of these references to 8647. *We should go back to business as usual, unless someone is inciting violence along with those numbers or adding egregious and threatening language.*

Ex. B. [014157] (emphasis added).

The Amazon Information

38. Pursuant to a Rule 17(c) subpoena authorized by the Court, Mr. Comey's defense obtained records of products that were offered for sale on the Amazon ecommerce platform displaying the numbers "8645," "8646," or "8647," prior to May 15, 2025.[15] Ex. MM. The materials returned were extremely voluminous.[16] I understand that to sell a product on Amazon, a vendor needs to have an Amazon Store Identification Number ("ASIN"). An ASIN authorizes a vendor to sell a product, but having an ASIN does not mean that the vendor will complete any sales. A conservative analysis of the information provided by Amazon in response to the subpoena indicates that prior to Mr. Comey's post, the total number of ASINS for products featuring the logo "8645" was 97,797; for products featuring the logo "8646" was 29,837; and for products featuring the logo "8647" was 81,418. The total for products featuring any of the three logos was 209,052.

39. The subpoena also sought information from Amazon on an anonymized basis concerning the number of federal law enforcement inquiries (including grand jury subpoenas, trial

---

[15] The relevant time period spanned from January 2017 to May 15, 2025 for "8645"; from January 2021 to May 15, 2025 for "8646"; and from January 2025 to May 15, 2025 for "8647."

[16] The materials produced in response to the subpoena included 126,044 products for "8645," 34,920 for "8646" and 114,473 for "8647." Because Mr. Comey's defense team noticed that there were some products associated with the three numbers that might not be relevant (i.e. a chandelier for sale where "8645" might be a model number), we filtered the returns received from Amazon to require an additional indicator in the listing that the product was relevant (e.g. a notation such as "impeach," "resist," "Biden," or "Trump") in order to come up with an estimation by the defense that would be conservative. The numbers cited above were the results obtained after employing filter terms. The excel files are extremely voluminous, but the defense is ready to provide them at the Court's request.

subpoenas, or other legal process) relating to the purchase or sale of any of those products from January 1, 2017, up to May 15, 2025. Amazon did not locate any responsive information.

<u>The Execution of the March Search Warrant</u>

40. The execution of the March warrant resulted in the Government seizing attorney-client communications between Mr. Comey and two attorneys widely known to represent him: David Kelley and Daniel Richman. In proposing an attorney-client filter protocol to screen communications that included text exchanges, the Government filtered only for Mr. Kelley's office landline numbers and not his cellphone number. Ex. OO. The Government made no provision to screen Mr. Richman's communications. *Id*. Mr. Richman had been named in widely publicized judicial opinions in both EDVA and the District of Columbia within the prior year criticizing the Government's earlier invasion of attorney client communications between Mr. Comey and Mr. Richman.[17] By emails dated June 3, 2026 and June 5, 2026, the Government has agreed to quarantine those two conversations and has represented that those communications were reviewed by the First Assistant, two AUSAs, the case agent and an FBI supervisor, but only after the indictment was obtained.

<u>The April 2026 Interview of a Secret Service ATSAIC</u>

41. On April 20, 2026, the case agent interviewed the ATSAIC who corresponded with Mr. Kelley, apparently for the first time.[18] The ATSAIC "could not recall" if investigators asked Mr. Comey and Mr. Kelley during the interview for "the actual image" of the photograph of the

---

[17] *See, e.g.*, *Federal Judge Warns Justice Department It May be Veering Close to Mishandling Evidence in Comey Case,* CNN, November 5, 2005, at: https://www.cnn.com/2025/11/05/politics/james-comey-justice-department-evidence; *The Comey Case is Now Officially a Comedy of Errors*, by David French, New York Times, November 20, 2025, at: https://www.nytimes.com/2025/11/20/opinion/james-comey-prosecution-errors.html; and *Judge Blocks Prosecutors' Access to Comey's Lawyer's Emails and Data*, by Josh Gerstein and Kyle Cheney, December 6, 2025, at: https://www.politico.com/news/2025/12/06/judge-blocks-prosecutors-access-to-james-comeys-lawyers-emails-and-data-00679805.

[18] There is no record of a prior interview and the case agent noted in the report that the ATSAIC was "advised of the identity of the interviewing agent" at the beginning of the interview. Ex. PP [006039].

seashells during Mr. Comey's in-person interview on May 16, 2025. Ex. PP [006039] The ATSAIC did state during the interview that a request for the original photograph was "implied" in his May 23, 2025, email to Mr. Kelley because he did not use the phrase "screenshot" in his request. Ex. QQ. [012488] The ATSAIC also stated that he did not know if any other law enforcement officer had followed up to ask Mr. Kelley for the actual original photograph of the seashells arrangement. He stated that "he did not do so." Ex. PP.

<u>Mr. Petracca's Role in The Return of the Indictment</u>

42. The Indictment was returned on Tuesday, April 28, 2026, by a Wilmington grand jury. AUSA Matthew Petracca, the sole signatory on the Indictment, was appointed as an AUSA effective on Sunday, April 26.[19] Prior to that time, Mr. Petracca served as a Special Assistant United States Attorney.[20] The discovery materials first indicate his participation in the case on April 22, less than a week before the indictment. Mr. Petracca at all times interacted professionally with the defense team. The last substantive contact with Mr. Petracca that I recall occurred during a telephone call on May 11 where we discussed proposed protections to be included in the protective order concerning discovery. Mr. Petracca noted at the time that the government was still pulling discovery materials together. On May 15, 2026, in response to an email I sent him, I received a bounce-back message indicating that Mr. Petracca was out of the office for a week without access to email beginning on May 15. Mr. Petracca withdrew from the case officially on May 29 and I understand that he transferred to the Civil Division.

---

[19] The Government provided us with a redacted personnel document at our request establishing that Mr. Petracca's status as an Assistant United States Attorney became effective on that date. Thus, we do not contest Mr. Petracca's legal authority to sign the indictment on April 28, 2026.

[20] Documents reviewed in discovery reflect Mr. Petracca's status as a Special Assistant United States Attorney as late as the evening of Friday, April 24. [012083]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: _July 28, 2026_

_Patrick J. Fitzgerald_ (signature)
Patrick J. Fitzgerald

Sworn to and subscribed before me this _28_ day of _July_, 2026.

_Roger Mauricio Mejia_, Notary Public State of _Indiana_

My Commission Expires: _July 16, 2032_

[Seal]

NOTARY PUBLIC
SEAL
STATE OF INDIANA

ROGER MAURICIO MEJIA
Commission Number NP0757564
My Commission Expires
July 16, 2032

21