IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| v. | ) | Case No.: 4:26-CR-00016-FL-RN |
| | ) | |
| James B. Comey, Jr., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JAMES B. COMEY JR.'S REPLY IN SUPPORT OF MOTION TO DISMISS FOR LACK OF A TRUE THREAT**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..... 1
ARGUMENT ..... 2
I. THE INDICTMENT FAILS AS A MATTER OF LAW ..... 2
A. The Court Need Only Consider The Ordinary Meaning Of Mr. Comey's Post To A Reasonable Person, Based On The Allegations In The Indictment ..... 2
B. Any "Disputed Factual Context" Is Irrelevant To The Legal Question Here ..... 4
C. Reasonable Observers Would Not Construe Mr. Comey's Post As A Threat ..... 6
II. FIRST AMENDMENT PRINCIPLES REQUIRE DISMISSAL ..... 10
CONCLUSION ..... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biden v. Nebraska*,
600 U.S. 477 (2023) ....................2

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ....................5

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) ....................4

*Chiles v. Salazar*,
146 S. Ct. 1010 (2026)....................10

*Counterman v. Colorado*,
600 U.S. 66 (2023)....................4, 5, 9

*Dombrowski v. Pfister*,
380 U.S. 479 (1965)....................10

*Dubin v. United States*,
599 U.S. 110 (2023)....................2, 3

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011)....................8

*Feminist Majority Found. v. Hurley*,
911 F.3d 674 (4th Cir. 2018) ....................2

*Helvering v. Gregory*,
69 F.2d 809 (2d Cir. 1934) ....................8

*State v. Van Pelt*,
49 S.E. 177 (N.C. 1904)....................10

*Sw. Airlines Co. v. Saxon*,
596 U.S. 450 (2022)....................3

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012)....................7

*United States v. Alvarez*,
567 U.S. 709 (2012) ....................6

*United States v. Armel*,
585 F.3d 182 (4th Cir. 2009) ....................4

**Page(s)**

*United States v. Bly*,
510 F.3d 453 (4th Cir. 2007) ....10

*United States v. Brewbaker*,
87 F.4th 563 (4th Cir. 2023) ....2, 8, 9, 10

*United States v. Burger*,
170 F.4th 395 (5th Cir. 2026) ....3

*United States v. Carrier*,
708 F.2d 77 (2d Cir. 1983)....9

*United States v. Christenson*,
653 F.3d 697 (8th Cir. 2011) ....9

*United States v. Hanna*,
293 F.3d 1080 (9th Cir. 2002) ....9

*United States v. Knox*,
396 U.S. 77 (1969)....3

*United States v. Pope*,
613 F.3d 1255 (10th Cir. 2010) ....2

*United States v. Roberts*,
915 F.2d 889 (4th Cir. 1990) ....6

*United States v. Weaver*,
659 F.3d 353 (4th Cir. 2011) ....3, 6

*United States v. Wheeler*,
776 F.3d 736 (10th Cir. 2015) ....9

*United States v. White*,
670 F.3d 498 (4th Cir. 2012) ....8, 9

*USPS v. Konan*,
607 U.S. 391 (2026)....3

*Watts v. United States*,
394 U.S. 705 (1969) ....4, 8, 10

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

### Other Authorities

John Kifner, *War in the Gulf*, N.Y. Times (Feb. 3, 1991) ..............................................................7

## INTRODUCTION

This motion raises one dispositive legal question: Based on the indictment's allegations, would reasonable observers have viewed Mr. Comey's social-media post as a true threat? To resolve that objective legal question, the Court need only consult the indictment, dictionaries, and undisputed public documents. Those materials make the answer straightforward: reasonable people would not have viewed a photo of seashells on a beach arranged in "86 47"—with the caption "Cool shell formation on my beach walk"—as a serious expression of Mr. Comey's intent to harm the President. Instead, they would have viewed it as a political statement.

Seeking to convert that legal question into a jury issue, the government offers what it calls "factual context" for Mr. Comey's post, citing assassination attempts on the President, Mr. Comey's novel, a talk-show interview, and statements from a former mobster. According to the government, "[o]nly a jury can resolve" "what that context means." Opp. 14. But none of that context bears on the legal question here—for instance, a novel published on May 20, 2025, cannot illuminate how reasonable observers would have understood a post on May 15, 2025. At most, the government's "context" bears on *separate* issues, like Mr. Comey's state of mind.

On the actual question before the Court, the government has little to offer. It cites a 20-year-old slang dictionary and a 34-year-old newspaper article that calls "86" "military jargon." But these scattered sources only underscore how rarely "86" connotes violence. And even if "86" can occasionally mean "to kill," the government never grapples with the full phrase—"86 47"—which can only be understood to convey political opposition. Finally, even if "86 47" could somehow mean "Kill President Trump," it still would not constitute a threat. A call for *others* to commit violence can only be incitement—which the indictment does not charge. The

government's attempt to prosecute an incitement case through a threats indictment violates settled law. The indictment must be dismissed.

## ARGUMENT

### I. THE INDICTMENT FAILS AS A MATTER OF LAW

"[D]istrict courts have as much of a responsibility to police criminal indictments as they do civil complaints." *United States v. Brewbaker*, 87 F.4th 563, 572 (4th Cir. 2023). Yet the government asks this Court to abdicate its responsibility because "the 'true threat question" supposedly "cannot be resolved before trial." Opp. 14. No support exists for such a categorical view. Instead, the government's authorities state only that "[g]enerally, what is or is not a true threat is a jury question." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 692 (4th Cir. 2018). But "generally" does not mean "always." And the Motion cites (at 10-11) several cases in which courts dismissed indictments that failed to allege a true threat. Like the motions in those cases, Mr. Comey's motion "present[s itself] for resolution before trial because" it "focuses solely on the facts alleged in the indictment and their legal adequacy." *United States v. Pope*, 613 F.3d 1255, 1260 (10th Cir. 2010). And dismissal is required because "the allegations in the indictment—even if proven—would not satisfy the elements of the charged offense." *Brewbaker*, 87 F.4th at 579.

#### A. The Court Need Only Consider The Ordinary Meaning Of Mr. Comey's Post To A Reasonable Person, Based On The Allegations In The Indictment

This Court can dismiss the indictment by applying objective, undisputed sources of meaning to the alleged facts. The government asserts that Mr. Comey "relies on purported 'context' that is not in the indictment." Opp. 19. But Mr. Comey's argument turns only on *linguistic* context, not "factual context." *Id.* at 25. "Language takes meaning from its linguistic context," which includes "[b]ackground" understandings and "conventions." *Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, J., concurring) (citation omitted); *see Dubin v. United States*,

599 U.S. 110, 120 (2023) (relying on "[l]inguistic … context"). This motion turns exclusively on indicia of linguistic context, including dictionaries and undisputed public records showing contemporary usage of "86 47."

As the government recognizes (at 16), courts resolve "question[s] of statutory interpretation" at the motion-to-dismiss stage. *See United States v. Weaver*, 659 F.3d 353, 355 & n.* (4th Cir. 2011). Courts interpret statutory "language according to its 'ordinary, contemporary, common meaning.'" *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (citation omitted). In so doing, they consult public documents like "dictionaries" and "newspapers." *USPS v. Konan*, 607 U.S. 391, 400 (2026). Here, the Court must discern the "ordinary, contemporary, common meaning" of Mr. Comey's "86 47" post, as it is alleged in the indictment. The government offers no reason why the basic tools of linguistic interpretation should be off limits here.

The government's authorities (at 15) do not support its categorical argument against resolving threats cases on a motion to dismiss. In *United States v. Knox*, 396 U.S. 77 (1969), the Court merely held that "evidentiary questions," such as whether a defendant made a false statement "willfully," "should not be determined on" a motion to dismiss. *Id.* at 83 & n.7. But Mr. Comey seeks dismissal based on "the threshold objective requirement for a threats prosecution," not his lack of *mens rea*. Mot. 10 n.1. And in *United States v. Burger*, 170 F.4th 395 (5th Cir. 2026), the court reversed the dismissal of a threats indictment because the district court "resolved a disputed factual question" about the "role-playing context" of a particular online game—an inquiry that required "further evidence." *Id.* at 405-06. But here, there is no specialized context to parse. Interpreting a social-media post to billions of users simply depends on its "ordinary, contemporary, common meaning." *Saxon*, 596 U.S. at 455.

The government's approach would treat threats prosecutions differently than other attempts to impose liability for "a form of pure speech." *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam). Courts regularly dismiss complaints and indictments that fail to allege obscenity, defamation, and libel. Mot. 27-28. In so doing, they ask whether the challenged statements "can be reasonably read to express the … meanings ascribed to [them] by the plaintiffs" or government. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1091 (4th Cir. 1993). The government does not even address those analogous areas of law—much less justify treating threats differently.

### B. Any "Disputed Factual Context" Is Irrelevant To The Legal Question Here

The government seeks to manufacture "disputed factual context" by "preview[ing]" certain purported "evidence" it would seek to present at trial. Opp. 2. But that "evidence" is irrelevant to the issue here: whether a reasonable person would view Mr. Comey's post as a "serious expression[]" of his intent to "commit an unlawful act of violence." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citation omitted).

To start, the government observes (at 3) that "President Trump has been the target of repeated assassination attempts." But the government does not contend that any of those attempts involved references to "86 47," and so they shed no light on the objective meaning of that phrase.

Next, the government quotes at length from Mr. Comey's novel. *Id.* at 5-7. But that novel does not use the phrase "86" and was published "five days" *after* Mr. Comey's seashells post. *Id.* at 4. A novel released on May 20 could not inform how "an ordinary reasonable" person "would [have] interpret[ed]" Mr. Comey's post on May 15. *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009). The government instead seems to rely on the novel to support its misguided theory of *mens rea*—suggesting, for instance, that Mr. Comey would have believed that "86" meant "kill"

because his novel "'uses the euphemism 'get rid of' … as equivalent to 'kill.'" Opp. 9. But again, Mr. Comey's motion does not challenge the *mens rea* element. Mot. 10 n.1.

Relatedly, the government quotes Mr. Comey's interview with Stephen Colbert and text messages with his publishing agent—apparently to imply that Mr. Comey had "financial incentive to stir up controversy." Opp. 18; *see id.* at 10-11. But even if that implication were based in reality (it is not), it would lack relevance to the sole element at issue here: the objective, reasonable meaning of the language charged as a threat. At most, the government's purported evidence would speak to Mr. Comey's state of mind, which is not the subject of his motion.

The government fares no better in quoting (at 9) a "former mob boss" saying that "there is 'no way that Comey did not know'" that "86 meant 'kill.'" What Mr. Comey supposedly "knew" relates to the *mens rea* element—not the objective-threat element at issue here. And to the extent the mob boss asserted that "86" is "a term of art in the context of organized crime" meaning "to kill," *id*. at 18-19, that only underscores that members of the public who are not privy to the private language of organized crime families would not understand it that way.

Nor does the supposed "public outcry" create a triable issue. *Id*. at 9. Even if Mr. Comey's relative saw the post as "a call for violence," *id.*, that does not imply it was a *true threat*. As elaborated below, exhorting members of the public to commit violence may be incitement if a statement satisfies the rigorous standard from *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969) (per curiam). But the indictment here charges only the distinct crime of a threat—which requires a "'serious expression[]' conveying that a *speaker* means to 'commit an act of unlawful violence.'" *Counterman*, 600 U.S. at 74 (emphasis added; citation omitted). The reactions of Mr. Comey's relative and neighbors do not imply that they viewed Mr. Comey's post as a threat, rather than as abstract "advocacy of the use of force" by another. *Brandenburg*, 395 U.S. at 447. The same logic

applies to Mr. Comey's later statement that he "didn't realize some folks associate those numbers with violence." Opp. 9. Just because some people associated "86 47" with violence does not mean they understood Mr. Comey to be saying *he* would commit violence against the President.

The government also points to "the reactions of ... the FBI and Secret Service." *Id*. at 18. But the mere fact that the Secret Service briefly investigated Mr. Comey's post cannot turn a political statement into a true threat. Otherwise, the government would have carte blanche power to prosecute any speech it investigated. Such a regime "would give government a broad censorial power unprecedented … in our constitutional tradition." *United States v. Alvarez*, 567 U.S. 709, 723 (2012) (plurality opinion). And while the Fourth Circuit has cited law-enforcement reactions to support a threats conviction, it did so where the defendant explicitly "notified" a Supreme Court Justice in a letter that she was "to die"—and where *every* observer "took the letter quite seriously." *United States v. Roberts*, 915 F.2d 889, 890-91 (4th Cir. 1990).

Ultimately, the government's asserted "factual context" is immaterial. Opp. 2. This Court can thus decide the "purely legal question" before it, *Weaver*, 659 F.3d at 355 n.*: whether a reasonable person would view Mr. Comey's post, as alleged in the indictment, as a true threat.

### C. Reasonable Observers Would Not Construe Mr. Comey's Post As A Threat

As a matter of law, reasonable observers would not understand Mr. Comey's post as a serious expression of Mr. Comey's intent to harm the President. The indictment alleges that Mr. Comey "publicly posted a photograph on the internet social media site Instagram which depicted seashells arranged in a pattern making out '86 47,'" Dkt. 1 at 1-2, with the caption "Cool shell formation on my beach walk." The government contends (at 7) that "[t]here is no serious dispute that an objective viewer of Comey's post could read it to mean 'Kill President Trump.'" The government has it backwards: objective viewers would see the post as a political statement. But

even if the government's contention were correct, the post would not constitute a true threat *by Mr. Comey*. The government's contrary argument conflates threats and incitement.

To start, the ordinary meaning of "86" is not "kill"; it is "to get rid of," Mot. 12 (citing various dictionaries). Most common dictionaries—including Merriam Webster—do not list "to kill" as a meaning of "86." The government cites only a 2005 edition of *Cassell's Dictionary of Slang*, which includes as a secondary entry: "1970s+ … to kill, to murder; to execute judicially." Doc. 54-7 at 5; *see* Opp. 7. But a single definition in a slang dictionary from 2005 cannot establish the ordinary meaning of "86" in 2025. And a definition that appears only in a special-purpose dictionary—and is "absent from many dictionaries" that catalogue prevalent meanings—"is hardly a common or ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 569 (2012).

The government also cites a 1991 *New York Times* article about the Gulf War, which quotes a servicemember saying that she "hate[s] to see the guys always getting eighty-sixed." John Kifner, *War in the Gulf*, N.Y. Times (Feb. 3, 1991); *see* Opp. 9. But, recognizing that most readers would not understand the phrase, the article clarifies that "86" is "military jargon for killed in action." Kifner, *supra*. That need to clarify shows that the ordinary meaning of "86" is *not* "to kill"—and that, at most, the term has that meaning only in specialized contexts. And a single 34-year-old article hardly reveals a meaning that has entered common usage; to the contrary, the government's need to scour dated archives only underscores its atypical interpretation.

Even if one unconventional meaning of "86" is "to kill," that would not suggest that a social-media post of seashells arranged as "86 47" connotes violence. To the contrary, people routinely use "86," in conjunction with a numerical shorthand for a President's term of office, as a statement of opposition to that President—and to suggest that he should be removed from office through the political process. Mot. 14 (citing examples from undisputed public records). The

government does not contest this point. Instead, it asks the Court to define both "86" and "47" in isolation and then conclude that the two numbers together mean "Kill President Trump." Opp. 7. But that "treats the term [86 47] as simply the sum of its two [parts]," even though "two words together may assume a more particular meaning than those words in isolation." *FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011). That is why, for instance, "[w]e understand a golden cup to be a cup made of or resembling gold," whereas "[a] golden boy … is one who is charming, lucky, and talented." *Id.* Thus, "the meaning of" "86 47" is "more than that of the separate" numbers 86 and 47, just "as a melody is more than the notes." *Helvering v. Gregory*, 69 F.2d 809, 810-11 (2d Cir. 1934) (Hand, J.). And read as a whole, "86 47" is a statement of nonviolent political opposition.

The government's argument would fail even if "86 47" were implausibly construed to reference violence. Such a post would be precisely "the kind of political hyperbole" that falls outside the "statutory term" of "true 'threat.'" *Watts*, 394 U.S. at 708. The government notes that *Watts* followed a jury conviction. But *Watts* is now binding precedent setting the bounds of the threats statutes. If the defendant's statement in *Watts* that he would aim a gun at the President was not a true threat, Mr. Comey's even more overtly political post cannot be either. Under *Watts*, the indictment's allegations, taken as true, "would not state an offense." *Brewbaker*, 87 F.4th at 572.

Regardless, the indictment is fatally flawed for an independent reason: Mr. Comey's post gives no indication of *his* intent to engage in violence. Mot. 20-21. The government seeks (at 22) to cure that defect by arguing that "statements suggesting the President should be killed (by whatever means)" can constitute a threat. But Fourth Circuit precedent forecloses that argument. In *United States v. White*, 670 F.3d 498 (4th Cir. 2012), the court held that the defendant's posts "to the public generally" "call[ing] on others to kill" an activist amounted to "political hyperbole," not "a true threat." *Id.* at 513. That is because, while the posts "clearly called for someone to kill"

the activist, they did not "actually provide[] a threat from [the defendant] that expressed an intent to kill [him]." *Id.* The government's suggestion (at 24) that "*White* did not concern statements that could be read to mean 'Kill' anyone" contradicts the Fourth Circuit's own characterizations.

The government's reliance (at 23) on *United States v. Wheeler*, 776 F.3d 736 (10th Cir. 2015), is misplaced. There, the Tenth Circuit explained that exhortations to others "may amount to true threats" where "a reasonable person might believe the individuals ordered to take violent action are subject to the will of" the speaker. *Id.* at 744. Because the defendant's statements called on his "'religious followers' to take violent action," they could be interpreted as a threat. *Id.* at 743. Here, by contrast, no reasonable person would think that Instagram users who saw Mr. Comey's post were "subject to [his] will." *Id.* at 744. Instead, as in *White*, Mr. Comey had no "control over those other persons" in "the public generally" who saw his post. 670 F.3d at 513.[*]

The government's attempt (at 24) to blur the "distinction between threats and incitement" is also foreclosed by *Counterman*. There, the Court explained that its "incitement decisions are distinguishable" from its threats decisions because incitement "is commonly a hair's-breadth away from political 'advocacy.'" 600 U.S. at 81-82. *Counterman* thus "draws a hard line" between the two doctrines. *Id.* at 97 (Sotomayor, J., concurring in part). And yet the government seeks to erase that very line. The government cannot circumvent *Brandenburg* by prosecuting incitement based on a threats indictment. Doing so would "constructively amend the indictment" by "broaden[ing] the possible bases for conviction beyond those included in the indictment." *Brewbaker*, 87 F.4th

[*] None of the government's other authorities advances its position that exhortations to the general public can constitute threats. *See United States v. Christenson*, 653 F.3d 697, 698 (8th Cir. 2011) (defendant sent email to the White House stating "[I] would kill [O]bama if [I] could"); *United States v. Hanna*, 293 F.3d 1080, 1083 (9th Cir. 2002) (defendant sent letter stating that "[a]ll filth herein will be hanged by the feet and their throat slit," along with reference to President Clinton); *United States v. Carrier*, 708 F.2d 77, 79 (2d Cir. 1983) (defendant stated to a judge that "[t]he only thing I will do is blow the [P]resident's head off").

at 573 (citation omitted). This Court should reject the government's effort to recast its charge.

## II. FIRST AMENDMENT PRINCIPLES REQUIRE DISMISSAL

The threats statutes, "which make[] criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind." *Watts*, 394 U.S. at 707. Yet the government's opposition scarcely mentions the First Amendment, fixating instead on "the role of the jury" in criminal cases. Opp. 25 (citation omitted). While juries serve an essential function in finding facts, simply citing "factual context" that is *unrelated* to the sole legal question at issue cannot be enough to defeat a motion to dismiss. Here, it is unequivocally the Court's role to answer the legal question Mr. Comey raises. *Cf. United States v. Bly*, 510 F.3d 453, 457 (4th Cir. 2007) (reviewing *de novo* whether statement "contains either constitutionally protected 'political hyperbole' or an unprotected 'true threat.'").

The government's position is antithetical to our Nation's history and tradition. On the government's view, it could force individuals to stand trial simply by claiming that their speech refers to "the death of" the President—a practice the Founders repudiated. *State v. Van Pelt*, 49 S.E. 177, 181 (N.C. 1904). Even if an individual were acquitted after trial, the damage would be done: "the chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965). And if the government succeeds in pressing this case to trial, it will only be emboldened to bring further prosecutions designed to silence political opponents. Dismissal is the only remedy that can safeguard "the inalienable right of every individual to decide for himself 'how best to speak.'" *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026) (citation omitted).

## CONCLUSION

For the foregoing reasons, the indictment should be dismissed with prejudice.

Dated: September 1, 2026

Respectfully submitted,

JAMES B. COMEY, JR.
By Counsel

*/s/ Joseph Zeszotarski*
Joseph Zeszotarski
(N.C. Bar No. 21310)
Gammon & Zeszotarski, PLLC
P.O. Box 1127
Raleigh, NC 27602
Telephone: 919-521-5878
jzeszotarski@ghz-law.com

*Local Rule 57.1 Counsel for Defendant*

Patrick J. Fitzgerald*
(Mich. Bar No. P86579)
P.O. Box 277
New Buffalo, MI 49177
Telephone: (312) 758-4454
patrickjfitzgeraldlawoffice@gmail.com

*/s/ Ephraim A. McDowell*
Ephraim A. McDowell*
(D.C. Bar No. 1631429)
Alexander J. Kasner*
(Cal. Bar No. 310637)
Elias S. Kim*
(D.C. Bar No. 1673678)
Claire Groden*
(D.C. Bar No. 1738682)
Dev P. Ranjan*
(D.C. Bar No. 90019329)
COOLEY LLP
1299 Pennsylvania Ave. NW, Suite 700
Washington, DC 20004
Telephone: (202) 842-7800
emcdowell@cooley.com
akasner@cooley.com
ekim@cooley.com
cgroden@cooley.com
dranjan@cooley.com

Rebekah Donaleski*

(N.Y. Bar No. 4986246)
Mikhaila R. Fogel*
(Mass. Bar No. 713095)
COOLEY LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
rdonaleski@cooley.com
mfogel@cooley.com

Michael R. Dreeben*
(D.C. Bar No. 370576)
600 New Jersey Ave. NW
Washington, DC 20001
Telephone: (202) 695-2562

**Special Appearance pursuant to Local Criminal Rule 57.1(e)*

*Counsel for Defendant James B. Comey, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 1st day of September 2026, a true copy of the foregoing document was filed electronically through the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

<u>*/s/ Ephraim A. McDowell*</u>
Ephraim A. McDowell
*Counsel for Defendant James B. Comey, Jr.*